## Martin Olive, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 14406–08.          Filed August 2, 2012.

P operates a sole proprietorship whose principal business is the retail sale of medical marijuana pursuant to California law. The business also provides minimal activities and services incident to the sales. P failed to maintain sufficient records to substantiate the business' income or expenditures. *Held*: P underreported the business' gross receipts in amounts R alleges in an amendment to answer. *Held*, *further*, P may deduct cost of goods sold for the business in amounts greater than those R allows. *Held*, *further*, I.R.C. sec. 280E precludes P from deducting any expense related to the business in that the business is a single business that consists of trafficking in a controlled substance. *Californians Helping to Alleviate Med. Problems, Inc. v. Commissioner*, 128 T.C. 173 (2007), distinguished. *Held*, *further*, P is liable for accuracy-related penalties under I.R.C. sec. 6662(a) to the extent stated.

*Henry G. Wykowski* and Chris Wood (student), for petitioner.

*Daniel J. Parent*, for respondent.

Kroupa, *Judge*: This case stems from the operation of petitioner's sole proprietorship, the Vapor Room Herbal Center (Vapor Room). The Vapor Room's principal business is the retail sale of marijuana (medical marijuana) pursuant to the California Compassionate Use Act of 1996 (CCUA), codified at Cal. Health & Safety Code sec. 11362.5 (West 2007).[1] The Vapor Room provides minimal activities and services as part of its principal business of selling medical marijuana.

Respondent determined deficiencies of $367,531 and $1,146,633 in petitioner's Federal income tax for 2004 and 2005, respectively, after determining that petitioner failed to substantiate any costs of goods sold (COGS) or expenses reported for the Vapor Room. Respondent also determined for

---

[1] Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code (Code), Rule references are to the Tax Court Rules of Practice and Procedure and dollar amounts are rounded to the nearest dollar.

19

the respective years that petitioner was liable for section 6662(a) accuracy-related penalties of $73,506 and $229,327 due to substantial understatements of income tax or, alternatively, negligence or disregard of rules and regulations. Respondent, in an amendment to answer, increased the deficiencies to $692,501 for 2004 and $1,199,814 for 2005 to reflect unreported gross receipts that respondent discovered after he issued the deficiency notice. Respondent correspondingly increased the accuracy-related penalties to $138,500 and $239,963.

We decide as to the Vapor Room for 2004 and 2005:

1. whether petitioner underreported gross receipts in amounts respondent alleges in an amendment to answer. We hold he did;

2. whether petitioner may deduct COGS in amounts greater than those respondent allows. [2] We hold he may to the extent stated;

3. whether petitioner may deduct his claimed expenses. We hold he may not; and

4. whether petitioner is liable for the accuracy-related penalties. We hold he is to the extent stated.

FINDINGS OF FACT

I. *Preliminaries*

The parties submitted stipulated facts and exhibits. We incorporate the stipulated facts and exhibits by this reference. Petitioner is a high school graduate who resided in California when he filed the petition. He filed Federal income tax returns for 2004 and 2005 and included in each return a Schedule C, Profit or Loss From Business (Sole Proprietorship), reporting the Vapor Room's gross receipts, COGS and expenses for the corresponding year. He reported that the Vapor Room's "principal business" is "Retail Sales" and that its product is "Herbal."

---

[2] COGS is not a deduction within the meaning of sec. 162(a) but is subtracted from gross receipts in determining a taxpayer's gross income. *See Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477 (1977), *aff'd*, 630 F.2d 670 (9th Cir. 1980); sec. 1.162–1(a), Income Tax Regs. We refer to COGS as a deduction for convenience.

## II. *CCUA*

The State of California's voters approved the CCUA as a ballot initiative in 1996. The CCUA is intended to ensure that "seriously ill Californians" (recipients) can obtain and use marijuana if physicians recommend marijuana as beneficial to recipients' health. Numerous medical marijuana dispensaries were formed in California to dispense medical marijuana to recipients. [3] Medical marijuana, however, is a controlled substance under Federal law.

## III. *Petitioner Forms the Vapor Room*

Petitioner, while pursuing a college degree in arts and education, became involved in the medical marijuana industry by volunteering at a medical marijuana dispensary in San Francisco, California. The dispensary had a single business, the dispensing of medical marijuana. Petitioner learned that an approximately 1,250-square-foot room in his low-income neighborhood of San Francisco was available to rent at a minimal cost and he decided to abandon his college studies during his second year and establish a medical marijuana dispensary in the room. He sought the help of local friends and marijuana suppliers and, on January 25, 2004, began operating an unlicensed medical marijuana dispensary as a sole proprietorship. [4] He named his dispensary the Vapor Room. [5] He established the Vapor Room so that its patrons, almost all of whom were recipients (including some with terminal diseases such as cancer or HIV/AIDS) could socialize and purchase and consume medical marijuana there. [6]

Petitioner designed the Vapor Room with a comfortable lounge-like, community center atmosphere, placing couches, chairs and tables throughout the premises. He placed vaporizers, games, books and art supplies on the premises for patrons to use at their desire. He set up a jewelry-store-like

---

[3] Approximately 50 medical marijuana dispensaries were located in California in 2004.

[4] Petitioner was oblivious to the licensing requirement for his medical marijuana dispensary. He received the requisite license from San Francisco in or about July 2004.

[5] A vaporizer is an expensive apparatus that extracts from marijuana its principal active component and allows the user to inhale vapor rather than smoke. Petitioner chose the name of his business to publicize that the Vapor Room had the requisite equipment to allow patrons to vaporize marijuana there.

[6] We say "almost all" because patrons also included designated caregivers of the recipients, who were entitled to receive medical marijuana for recipients. We use the term "patrons" to include only recipients.

glass counter with a cash register on top and jars of the Vapor Room's medical marijuana inventory displayed underneath and behind the counter.

IV. *Operation of the Vapor Room*

The Vapor Room was generally open for business (except on some holidays) on weekdays from 11 a.m. to 8:30 p.m., and on weekends from noon to 8 p.m. The Vapor Room sold nothing but medical marijuana (in three different forms) and its patrons went to the Vapor Room primarily to consume marijuana, knowing that it was readily available there.[7] Patrons also frequented the Vapor Room to socialize with each other incident to consuming marijuana. Petitioner required that each patron possess either a doctor's recommendation to use medical marijuana or a similar certificate the San Francisco government issued. This documentation contained the person's picture and identification number, but not his or her name. Patrons came to know at least the first name of the other patrons who regularly frequented the Vapor Room.

The Vapor Room's staff members (collectively, staff members) were petitioner and a few other individuals (four working as employees and an undisclosed number working as volunteers) and all staff members qualified under the CCUA to receive and consume medical marijuana. Neither the staff members nor the other patrons paid petitioner a stated fee to frequent the Vapor Room. Nor did petitioner require that any patron purchase medical marijuana from him to frequent the Vapor Room or to take part in its activities or services. Patrons had access to all of the activities and services that the Vapor Room provided and marijuana was routinely passed throughout the room for consumption without cost to patrons who wanted to partake.

The Vapor Room's sole source of revenue was its sale of medical marijuana and patrons did not specifically pay for anything else connected with or offered by the Vapor Room. Petitioner purchased for cash (or sometimes received for free) the Vapor Room's medical marijuana inventory from suppliers, each of whom was eligible under the CCUA to receive

---

[7] The medical marijuana in the Vapor Room's inventory was in the following three forms: (1) dried marijuana, (2) food (e.g., bakery goods, butter and candy) laced with marijuana and (3) a concentrated version of the principal active component of marijuana.

and consume marijuana. Petitioner typically purchased high-quality marijuana to dispense to the patrons and he allowed them to consume the marijuana virtually anywhere on the premises. Petitioner sold to the patrons for cash 93.5% of the marijuana that he received and he gave the rest to patrons (including himself and the other staff members) for free. One to three staff members monitored the counter in the Vapor Room and they explained to patrons the attributes and effects of the different types of medical marijuana in the Vapor Room's inventory. Petitioner set each patron's cost for the medical marijuana according to the quantity desired, the quality of the marijuana and the amount petitioner decided the patron should pay. Petitioner sometimes gave patrons medical marijuana for free. Petitioner and the other staff members occasionally sampled the medical marijuana inventory for free and they would regularly "hang out" at the Vapor Room after business hours and consume marijuana. Staff members and other patrons sometimes consumed medical marijuana together.[8]

Petitioner provided regular activities at the Vapor Room, such as yoga classes, chess and other board games and movies (with complimentary popcorn and drinks). Patrons sometimes consumed medical marijuana while participating in these activities. The Vapor Room regularly offered chair massages with a therapist. Patrons sometimes consumed medical marijuana before or after a massage. Patrons, while at the Vapor Room, regularly drank complimentary tea or water and they occasionally ate complimentary snacks or light food such as pizza and sandwiches.

Staff members explained to patrons the promoted benefits of vaporizing marijuana (as opposed to smoking it). The staff members also helped patrons understand how to operate a vaporizer and the staff members helped patrons operate a vaporizer upon request. Petitioner did not require that a patron buy medical marijuana from the Vapor Room as a condition of using one of the Vapor Room's vaporizers and patrons sometimes consumed in a vaporizer (or elsewhere in

---

[8] Petitioner was not forthcoming with the specific prices at which he sold his marijuana or the specific amount of medical marijuana that was consumed for free. Nor does the record contain a formula for the price that petitioner charged a patron for medical marijuana or reveal whether any discount price had a set floor such as the Vapor Room's cost. Petitioner, during 2004, sold approximately 32% of the marijuana (inclusive of the portion he dispensed for free) for less than what would otherwise have been the sale price.

the room) marijuana they obtained elsewhere. Staff members sometimes delivered medical marijuana to terminally ill patrons at locations other than the Vapor Room and joined those patrons in consuming marijuana at those other locations. The Vapor Room's staff members lived near the Vapor Room.

Patrons discussed with other patrons (sometimes one-on-one) their illnesses and their lives in general and they counseled one another on various personal, legal or political matters related to medical marijuana. Staff members (or other persons the Vapor Room retained) educated patrons or members of the public on medical marijuana and about using medical marijuana responsibly. The Vapor Room had a program through which patrons wrote letters to individuals who were incarcerated for distributing medical marijuana.

## V. *Vapor Room's Gross Receipts, COGS and Reported Income*

### A. *Reported Income*

Petitioner's tax returns for 2004 and 2005 reported that the Vapor Room's net income was $64,670 and $33,778, respectively.[9] The net income was calculated as follows:

|  | *2004* | *2005* |
|---|---|---|
| Gross receipts | $1,068,830 | $3,131,605 |
| COGS | 993,377 | 2,812,478 |
| Gross income | 75,453 | 319,127 |
| Expenses: |  |  |
| Advertising | -0- | 660 |
| Bank fees | -0- | 790 |
| Deductible meals and entertainment | -0- | 3,072 |
| Depreciation | -0- | 11,506 |
| Internet services and fee | 1,605 | -0- |
| Legal and professional services | -0- | 46,900 |
| Office | -0- | 13,337 |
| Payroll fees | -0- | 1,353 |
| Postage and delivery | -0- | 13 |
| Printing and reproduction | -0- | 1,952 |
| Rent | 4,000 | 14,300 |
| Repairs and maintenance | 730 | 3,505 |
| Security services | 750 | 412 |
| Supplies | 2,922 | -0- |

---

[9] Petitioner used the cash method to compute the Vapor Room's net income. Respondent does not challenge petitioner's use of that method. We discuss it no further.

|  | *2004* | *2005* |
|---|---|---|
| Taxes and licenses | -0- | 8,750 |
| Telephone | -0- | 965 |
| Travel | 776 | 10 |
| Utilities | -0- | 3,426 |
| Wages | -0- | 175,934 |
| Total | 10,783 | [1] 285,349 |
| Net profit | 64,670 | 33,778 |

[1] The expenses in this column actually total $286,885, or $1,536 more than $285,349. Petitioner apparently reported the Vapor Room's "Deductible meals and entertainment" at 100% of the reported cost and then reduced the $286,885 to $285,349 (without noting so) to take into account the 50% reduction of sec. 274(n).

## B. *Gross Receipts*

Staff members noted the amount of the Vapor Room's sales for each business day as shown on the cash register tape and counted the cash in the register. The total daily sales as ascertained by the cash register tape and by the daily count were recorded in a book (recording book).

Petitioner's Schedules C for 2004 and 2005 reported gross receipts of $1,068,830 and $3,131,605, respectively. The gross receipts reported on the Schedule C for 2004, however, did not include any gross receipts received before July 14, 2004.

## C. *COGS*

Petitioner's Schedules C for 2004 and 2005 reported that the Vapor Room's COGS were $993,337 and $2,812,478, respectively. These amounts were calculated as follows:

|  | *2004* | *2005* |
|---|---|---|
| Purchases less cost of items withdrawn for personal use | -0- | $2,796,724 |
| Cost of labor | $88,209 | -0- |
| Materials and supplies | 905,168 | 15,754 |
| COGS | 993,377 | 2,812,478 |

The labor amounts represent petitioner's payments to marijuana growers in return for marijuana that they grew.

D. *Expenses*

Petitioner paid the Vapor Room's expenses by using cash from the cash register or by using a check or a debit card drawn on a bank account that petitioner opened as a sole proprietor "DBA Vapor Room." Petitioner opened this account on July 6, 2004, and he regularly deposited funds into the account to cover the draws from the account.

Petitioner paid the Vapor Room's employees through a payroll service. Petitioner paid the employees (who were the same individuals in both 2004 and 2005) wages of $37,588 and $96,965. Petitioner reported those wages to the Internal Revenue Service for Federal employment tax purposes. None of the employees had a specific job at the Vapor Room and each employee at one time or another performed all required jobs.

Respondent concedes that petitioner paid the following ordinary and necessary business expenses during 2004 and 2005:

| Expense | 2004 | 2005 |
|---|---|---|
| Advertising | -0- | $650 |
| Bank and payroll (Paychex) fees | $557 | 1,271 |
| Bottled water | -0- | 473 |
| Employment taxes | 3,002 | 7,609 |
| Garbage | -0- | 317 |
| Office expense and supplies | 2,992 | 13,337 |
| Phone and Internet | 681 | 784 |
| Postage | -0- | 13 |
| Rent | 12,000 | 12,300 |
| Repairs and maintenance | -0- | 2,297 |
| Security alarm monitoring | 361 | 413 |
| Security system/locksmith | -0- | 11,506 |
| Utilities | 748 | 1,731 |
| Wages | 37,588 | 96,965 |
| Total | 57,929 | 149,666 |

The items underlying the office expense and supplies for 2004 include office supplies (e.g., labels), paper cups, a step ladder, a shredder, zip bags, glass canisters, a degreaser, marijuana rolling papers and lighters. The advertising expense for 2005 relates to advertisements aimed at medical marijuana audiences. The items underlying the office expense and supplies for 2005 include paper towels, marijuana-related calendars, magazines and books, marijuana

rolling papers, zip bags, vaporizer bags, lighters, brown paper bags, containers and storage jars.

### E. *Petitioner's Withdrawals*

Petitioner regularly took cash from the cash register to use personally, including to pay for personal trips to New York, New York, to Barcelona, Spain, to Amsterdam, the Netherlands, to Venice, Italy, to Cabo San Lucas, Mexico, and to the British Virgin Islands. He coded these withdrawals in the recording books so that the Vapor Room's employees would not know the amount of money he was taking from the business.

### VI. *Audit*

Respondent began auditing petitioner's 2004 tax return in April 2006 and respondent's revenue agent met with petitioner (accompanied by his independent accountant/tax preparer William Ehardt and an attorney) on July 6, 2006.[10] The revenue agent requested the Vapor Room's bank statements and substantiation for COGS and petitioner gave the revenue agent two documents Mr. Ehardt had prepared: a document entitled "Vapor Room Profit and Loss January through December 2004" (Ehardt P&L) and a document entitled "Vapor Room General Ledger As of December 2004" (Ehardt GL). The Ehardt GL reports that the Vapor Room's first sale occurred on July 14, 2004. The Ehardt P&L and the Ehardt GL each report that the Vapor Room's total income for 2004 was $1,068,830, which corresponds to the amount of gross receipts reported on the Federal income tax return for 2004. Many (but not all) of the expenditures shown on the Ehardt P&L and the Ehardt GL were reported on the return for 2004.

The revenue agent next met with Mr. Ehardt in August 2006 (the second and last meeting that the revenue agent had with petitioner or his representatives) and was informed that petitioner had "ledgers" showing cash received for sales and cash paid for purchases, but no further documents. Petitioner did not tender any ledgers at that time.

---

[10] Petitioner filed his Federal income tax return for 2005 during the last week of September 2006. The audit was expanded at or about that time to include 2005.

VII. *Deficiency Notice*

Respondent issued the deficiency notice to petitioner. The deficiency notice states that petitioner may not deduct any of the reported COGS on account of lack of substantiation. Petitioner, after the deficiency notice was issued, provided respondent's counsel with $25,776 in receipts for COGS for 2004 and $27,370 in receipts for COGS for 2005. Respondent concedes that petitioner may deduct those respective amounts as COGS for 2004 and 2005.

The deficiency notice also states that petitioner may not deduct any of the reported expenses on account of lack of substantiation. Respondent later conceded that petitioner substantiated the $57,929 and $149,666 of expenses previously mentioned but asserts that section 280E precludes any deduction of these expenses. Respondent's revenue agent had relied upon sections 280E and 6001 during the audit to disallow all of the Vapor Room's reported expenses, but the deficiency notice does not specifically say that. Respondent formalized the applicability of section 280E in a second amendment to answer.

VIII. *Ledgers*

Petitioner gave respondent five ledgers (collectively, ledgers) during this proceeding. The credible evidence in the record fails to establish when the ledgers were prepared. The ledgers, however, do not appear to be (and we do not find that they are) the same as the recording books.

The ledgers purport to show the Vapor Room's receipts and cash disbursements (not including payments through the Vapor Room's bank account) for January 25 through March 13, 2004; June 1 through October 30, 2004; November 1, 2004, through April 25, 2005; April 26 through October 8, 2005; and October 9, 2005, through February 18, 2006, respectively. Petitioner has never produced a ledger (or recording book) for the 79-day period from March 14 through May 31, 2004.

The ledgers show categories of cash received and expenditures made during each business day in a total figure for each category and they list few (and in some cases no) specifics on the components of the categories. The ledgers some-

times contain no identification for an expenditure. Petitioner cannot definitively identify some of the entries in the ledgers.

The ledgers (as respondent adjusted for 2004 to reflect the missing 79-day period) report that the Vapor Room's gross receipts for 2004 and 2005 were $1,967,956 and $3,301,898, respectively.

## OPINION

### I. *Overview*

California law allows petitioner to dispense medical marijuana to the recipients through the Vapor Room. Federal law prohibits taxpayers, however, from deducting any expense of a trade or business that consists of the trafficking of a controlled substance such as marijuana. *See* sec. 280E. We are asked to decide whether the Vapor Room, a medical marijuana dispensary permitted by California law, may deduct any of its expenses. We also are asked to decide whether petitioner underreported the Vapor Room's gross receipts, whether petitioner overreported the Vapor Room's COGS and whether petitioner is liable for an accuracy-related penalty.

We first discuss the burden of proof and our perception of the witnesses. We then decide the referenced issues.

### II. *Burden of Proof*

Petitioner bears the burden of proving that respondent's determination of the deficiencies set forth in the deficiency notice is incorrect. *See* Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Section 7491(a) sometimes shifts the burden of proof to the Commissioner, but that section does not apply where a taxpayer fails to satisfy the recordkeeping and substantiation requirements. *See* sec. 7491(a)(2)(A) and (B). Petitioner has failed to satisfy those requirements. Respondent bears the burden of proof only with respect to the increased deficiencies pleaded in the amendment to answer.[11] *See* Rule 142(a)(1).

---

[11] Petitioner does not argue that respondent bears the burden of proving the applicability of sec. 280E. We need not decide that issue because our resolution of that issue does not rest on which party bears the burden of proof. *See Estate of Morgens v. Commissioner*, 133 T.C. 402, 409 (2009), *aff'd*, 678 F.3d 769 (9th Cir. 2012); *see also Knudsen v. Commissioner*, 131 T.C. 185, 186–189 (2008).

III. *Witness Testimony*

We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences and choose between conflicting inferences in finding the facts of a case. The mere fact that one party presents unopposed testimony on that party's behalf does not necessarily mean that we will find the elicited testimony to be credible. We will not accept the testimony of witnesses at face value to the extent we perceive the testimony to be incredible or otherwise unreliable. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 84 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); *see also Ruark v. Commissioner*, 449 F.2d 311, 312 (9th Cir. 1971), *aff'g per curiam* T.C. Memo. 1969–48; *Clark v. Commissioner*, 266 F.2d 698, 708–709 (9th Cir. 1959), *aff'g in part and remanding* T.C. Memo. 1957–129.

Petitioner's testimony and the testimony of his other witnesses were rehearsed, insincere and unreliable. We do not rely on petitioner's testimony to support his positions in this case, except to the extent his testimony is corroborated by reliable documentary evidence. We also do not rely on the uncorroborated testimony of petitioner's other witnesses, three of whom are (or were) patrons of the Vapor Room and all of whom are closely and inextricably connected with the medical marijuana industry and with a desired furtherance of that movement.

IV. *Unreported Gross Receipts*

We start our analysis of the substantive issues by determining the amount of the Vapor Room's gross receipts. Petitioner reported that the Vapor Room's gross receipts were $1,068,830 for 2004 and $3,131,605 for 2005. Respondent did not adjust those amounts in the deficiency notice. Petitioner later, however, gave respondent the ledgers that revealed that the Vapor Room's gross receipts were greater than the reported amounts. Respondent then computed the Vapor Room's gross receipts using the ledgers. Respondent first totaled the cash that petitioner recorded in the ledgers for each year as sales receipts ($1,513,370 and $3,301,898, respectively). Respondent then extrapolated from the ledgers' recording of the sales receipts for 2004 that the Vapor Room's total sales during the missing 79-day period were

$454,586. Respondent concluded that the Vapor Room's gross receipts for 2004 and 2005 were $1,967,956 ($1,513,370 + $454,586) and $3,301,898, respectively, and asks the Court to find the same.

Petitioner does not dispute that he underreported the Vapor Room's gross receipts for 2004 and 2005 (including that he failed to report any gross receipts received before July 14, 2004). He asks the Court, however, to find that the Vapor Room's gross receipts for the respective years totaled $1,969,331 and $3,264,798 (i.e., $1,375 more and $37,100 less than the respective amounts respondent determined). He supports his proposed finding with citations to profit and loss statements that his current accountant, Marlee Taxy, C.P.A., prepared for the respective years. One statement reports without further explanation that the Vapor Room's "Sales (as per Ledger)" for 2004 were $1,948,882 (inclusive of a $450,904 adjustment to reflect the 79 missing days) and that its total income for 2004 also included a $20,448 upward adjustment for "Actual to agree with cash in Ledger" ($1,948,882 + $20,448 = $1,969,331). The other statement reports without further explanation that the Vapor Room's "Sales (as per Ledger)" for 2005 were $3,308,328 and that its total income for 2005 also included a $43,530 downward adjustment for "Actual to agree with cash in Ledger" ($3,308,328 − $43,530 = $3,264,798). Neither petitioner nor any of his witnesses explained the calculation of the numbers in those statements.

Petitioner's reporting in the ledgers of the Vapor Room's sales is reliable evidence of the amount of the Vapor Room's gross receipts for 2004 and 2005. Respondent and Ms. Taxy calculated the Vapor Room's gross receipts using those ledgers. They arrived at slightly different totals for each year. We place more weight on respondent's calculations. They were accompanied by sufficient detail. We accept respondent's computation as the more accurate calculation of the Vapor Room's gross receipts for 2004 and 2005. We hold that the Vapor Room's gross receipts for the respective years were $1,967,956 and $3,301,898. We note that petitioner in his answering brief sets forth no objection to respondent's request in his opening brief that the Court find that the ledgers (as adjusted for the missing period) stated that the

Vapor Room's sales during the respective years were in the amounts that respondent calculated.

## V. *COGS*

We now turn to the parties' dispute as to the Vapor Room's COGS. Petitioner argues that respondent arbitrarily determined the Vapor Room's COGS in the deficiency notice because the notice states that the Vapor Room's COGS were zero for 2004 and 2005. Petitioner argues that the burden of proof is therefore upon respondent. *See Helvering v. Taylor*, 293 U.S. 507, 515 (1935); *Palmer v. United States*, 116 F.3d 1309, 1312 (9th Cir. 1997). We disagree that respondent's determination of the Vapor Room's COGS was arbitrary so as to shift the burden of proof on that issue to respondent.

A cash method taxpayer like petitioner may generally deduct all ordinary and necessary expenses of the business upon payment of those expenses. *See* sec. 162(a). Deductions are strictly a matter of legislative grace, however, and petitioner must prove he is entitled to deduct the Vapor Room's claimed amounts of COGS (as well as the Vapor Room's claimed amounts of expenses). *See* Rule 142(a)(1); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934); *Goldsmith v. Commissioner*, 31 T.C. 56, 62 (1958); *Hahn v. Commissioner*, 30 T.C. 195, 198 (1958), *aff'd*, 271 F.2d 739 (5th Cir. 1959); *see also Briggs v. Commissioner*, T.C. Memo. 2000–380; *King v. Commissioner*, T.C. Memo. 1994–318, *aff'd without published opinion*, 69 F.3d 544 (9th Cir. 1995); *Whatley v. Commissioner*, T.C. Memo. 1992–567, *aff'd without published opinion*, 21 F.3d 1119 (9th Cir. 1994). Petitioner is required to maintain sufficient permanent records to substantiate the Vapor Room's deductions. *See* sec. 6001; *see also Briggs v. Commissioner*, T.C. Memo. 2000–380; sec. 1.6001–1(a), (d), Income Tax Regs. Respondent's determination in the notice of deficiency of the Vapor Room's COGS as zero reflects that petitioner failed to produce credible records supporting any greater deductions of COGS. Petitioner, in fact, concedes in his posttrial brief that he "freely admitted" to the revenue agent that he had no receipts for COGS.

Petitioner argues nonetheless that the ledgers alone are sufficient substantiation for taxpayers operating in the medical marijuana industry because, he states, that industry

"shun[s] formal 'substantiation' in the form of receipts." We disagree with petitioner that the ledgers standing alone are sufficient substantiation. The ledgers did not specifically identify the marijuana vendors or reflect any marijuana that was received or given away. The ledgers neither were independently prepared nor bore sufficient indicia of reliability or trustworthiness. The substantiation rules require a taxpayer to maintain sufficient reliable records to allow the Commissioner to verify the taxpayer's income and expenditures. *See* sec. 6001; sec. 1.6001–1(a), Income Tax Regs.; *see also Obot v. Commissioner*, T.C. Memo. 2005–195. Neither Congress nor the Commissioner has prescribed a rule stating that a medical marijuana dispensary may meet that substantiation requirement merely by maintaining a self-prepared ledger listing the amounts and general categories of its expenditures. It is not this Court's role to prescribe the special substantiation rule that petitioner desires for medical marijuana dispensaries and we decline to do so.

Petitioner seeks to strengthen the probative value of the ledgers through his and Ms. Taxy's testimony. He testified that he contemporaneously recorded in the ledgers all of the Vapor Room's purchases of marijuana and Ms. Taxy testified that she totaled the Vapor Room's COGS for the respective years at $1,651,554 and $2,713,128. Respondent rebuts that petitioner has failed to substantiate that the amount of the Vapor Room's COGS exceeded $25,776 for 2004 or $27,370 for 2005. Respondent concludes that the Vapor Room's COGS are limited to the amounts petitioner was able to substantiate to respondent's satisfaction. We disagree with both parties.

The Vapor Room's sales for the respective years were $1,967,956 and $3,301,898. We consider it unreasonable to conclude that the Vapor Room's COGS totaled the small amounts that respondent asks us to find. We also consider it unreasonable, however, to conclude that the Vapor Room's COGS are those amounts set forth in the ledgers. We do not believe that the COGS entries set forth in the ledgers are entirely accurate and we decline to rely upon those entries in their entirety. Petitioner consciously chose to transact the Vapor Room's business primarily in cash. He also chose not to keep supporting documentation for the Vapor Room's

expenditures. He did so at his own peril.[12] The mere fact that we rely on the ledgers to determine the amounts of the Vapor Room's gross receipts is not necessarily inconsistent with our refusing to rely upon the ledgers to determine the amount of the Vapor Room's COGS (or expenses). Nor are the ledgers necessarily accurate as to COGS (and expenses) simply because petitioner recorded more sales receipts in the ledgers than he did in the Federal income tax returns he filed for the years at issue. We find the expenditure entries in the ledgers vague and incomplete in many instances. Moreover, we seriously doubt that they were recorded contemporaneously or accurately with the expenditures.[13] We also doubt that petitioner made each recorded expenditure in the amount and for the purpose (if any) stated.[14]

We are left to ascertain the Vapor Room's COGS on the basis of the record. The evidence is not satisfactory for this purpose. We nevertheless must do our best with the materials at hand. "Absolute certainty in such matters is usually impossible and is not necessary; * * * [we] make as close an approximation as * * * [we] can, bearing heavily * * * upon the taxpayer whose inexactitude is of his own making." *Cohan v. Commissioner*, 39 F.2d 540, 543–544 (2d Cir. 1930); *accord Edelson v. Commissioner*, 829 F.2d 828, 831 (9th Cir. 1987) (stating that "a court should allow the taxpayer some deductions [under the *Cohan* rule] if the taxpayer proves he [or she] is entitled to the deduction but cannot establish the full amount claimed"), *aff'g* T.C. Memo. 1986–223; *see also Lollis v. Commissioner*, 595 F.2d 1189, 1190 (9th Cir. 1979),

[12] Petitioner asserts that he minimized the Vapor Room's use of checks because he did not want his bank to know that the Vapor Room was a medical marijuana dispensary. We find that assertion incredible, especially given that petitioner informed the bank that his business was named "Vapor Room."

[13] The ledgers apparently were not available at the start of this proceeding when petitioner admitted under Rule 90 that the Vapor Room started its business in July 2004. The ledgers show sales for the Vapor Room on most (if not all) of the days from January 25 through March 13, 2004, and June 1 through October 30, 2004.

[14] Petitioner informs us that California did not allow medical marijuana dispensaries to earn a profit for the years at issue. The need to report no profit may improperly cause a dispensary to understate gross receipts or to overstate expenditures. We are especially wary here, where petitioner by his own admission understated his gross receipts and took steps to disguise his cash withdrawals from his business to conceal them from his employees. We also note that petitioner in his petition challenged only respondent's disallowance of the COGS and expenses petitioner reported on the returns and stated in the petition that he had incurred the reported expenditures in the amounts stated (without mention of any greater or additional expense amounts).

*aff'g* T.C. Memo. 1976–15; *Goldsmith v. Commissioner*, 31 T.C. at 62.

We are aided, in small part, by the testimony of Henry C. Levy, C.P.A. Petitioner called Mr. Levy as an expert on the medical marijuana industry and the Court recognized him as such. Having said that, we generally found Mr. Levy to be unreliable. He was unreliable in that he was not sufficiently independent of petitioner and his cause (e.g., Mr. Levy is petitioner's current bookkeeper and accountant and has approximately 100 other medical marijuana dispensaries as clients). *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 86–87. In addition, his testimony improperly consisted mainly of legal opinions and conclusions.[15] *See Gibson & Assocs., Inc. v. Commissioner*, 136 T.C. 195, 229–230 (2011); *Alumax, Inc. v. Commissioner*, 109 T.C. 133, 171 (1997), *aff'd*, 165 F.3d 822 (11th Cir. 1999); *see also United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999).

We have broad discretion to evaluate the cogency of an expert's analysis. We may adopt only those parts of an opinion we consider to be reliable. *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294–295 (1938); *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 85–86; *IT & S of Iowa, Inc. v. Commissioner*, 97 T.C. 496, 508 (1991). Mr. Levy opined that the average COGS of three of his medical marijuana dispensary clients was 75.16% of their sales for 2005 and that part of his opinion comports with Dr. Gieringer's opinion that the COGS of medical marijuana dispensaries ranged from 70 to 85% of sales during the years at issue. We consider 75.16% of sales to be a reasonable measure of the Vapor Room's COGS. We therefore adopt that percentage of sales as a measure of the Vapor Room's COGS for each year at issue.

This does not mean, however, that the Vapor Room's COGS equals 75.16% of its gross receipts. We are mindful that this is not the right percentage because petitioner gave some of the Vapor Room's inventory to patrons for free and the parties dispute whether the Vapor Room's cost of that portion of the medical marijuana is includable in the Vapor Room's

---

[15] Petitioner also called Dale Gieringer, Ph.D., and Ms. Taxy to testify as experts on the medical marijuana industry and the Court recognized them as such. We similarly consider their testimony to be unreliable for similar reasons. We adopt their opinions only to the limited extent stated.

COGS. Petitioner argues that these costs are so includable. We disagree.

Petitioner did not sell the marijuana underlying these costs and he did not hold all the marijuana out for sale. These costs, therefore, hardly reflect the cost of the goods that petitioner sold. *See Fuller v. Commissioner*, 20 T.C. 308, 316 (1953), *aff'd*, 213 F.2d 102 (10th Cir. 1954). Petitioner acknowledges that inventory withdrawn for personal use is not included in a COGS calculation and petitioner withdrew the referenced medical marijuana from the Vapor Room's inventory of marijuana for sale. He personally consumed some of it and gave the rest to his selected patrons for free. Petitioner's claim that he gave the marijuana to needy patrons out of compassion, even if true (which we need not decide), does not dictate a different result.[16] Inventory that is given to a qualified charitable organization may receive special treatment. The recipients of petitioner's gratuities, however, were not qualified charitable organizations. Nor does the record or caselaw support petitioner's characterization of the free medical marijuana distributions as rebates to customers. We conclude that the Vapor Room's COGS for each year at issue equals 75.16% of the Vapor Room's gross receipts for the year, as further adjusted to take into account our finding that petitioner gave away 6.5% of the Vapor Room's purchases.[17] We therefore hold that the Vapor Room's COGS for 2004 and 2005 are $1,382,973 ($1,967,956 × 75.16% × 93.5%) and $2,320,396 ($3,301,898 × 75.16% × 93.5%), respectively.

## VI. *Expenses*

### A. *Overview*

We turn now to decide the parties' dispute on the deductibility of the Vapor Room's expenses. Respondent argues that petitioner failed to substantiate expenses in amounts greater than $57,929 for 2004 and $149,666 for 2005. Respondent also argues that section 280E precludes petitioner from

---

[16] Both staff members (including petitioner) and other patrons received medical marijuana for free. The record does not disclose how much of the free marijuana actually went to "needy" individuals.

[17] The medical marijuana petitioner gave away might arguably still qualify as an ordinary and necessary business expense under sec. 162(a). We need not decide that issue, however, because we hold later that sec. 280E precludes any such deduction.

deducting any of those amounts notwithstanding that the amounts were substantiated. Petitioner argues that he is entitled to deduct the Vapor Room's expenses in full. Petitioner asserts that the Vapor Room's expenses are as follows: [18]

| Expense | 2004 | 2005 |
|---|---|---|
| Advertising | $1,466 | $5,902 |
| Bank fees | 724 | 1,271 |
| Charity | -0- | 7,810 |
| Donations | 683 | 3,330 |
| Internet services and fee | 2,219 | 784 |
| Legal and professional services | 390 | 36,670 |
| Other | 12,787 | 24,596 |
| Payroll taxes | 2,876 | 7,418 |
| Rent | 14,369 | 12,300 |
| Repairs and maintenance | 1,328 | 11,486 |
| Security services | 827 | 5,988 |
| State | -0- | 1,547 |
| Supplies | 26,649 | 31,401 |
| Taxes and licenses | 195 | 2,500 |
| Travel and meals and entertainment | 2,549 | 3,602 |
| Utilities | 973 | 2,248 |
| Wages: | | |
|   Paid in cash | 133,071 | 161,751 |
|   Paid through Paychex | 37,588 | 96,965 |
| Total | [1] 236,502 | 417,569 |

[1] This column totals $238,694. Petitioner does not explain how his total differs.

Petitioner asserts that section 280E, if applicable, which he argues it is not, precludes deductions for the years at issue of only $12,636 and $20,748 of expenses. He calculates those amounts on the basis of his reading of our Opinion in *Californians Helping to Alleviate Med. Problems, Inc. v. Commissioner* (*CHAMP*), 128 T.C. 173 (2007). We disagree with petitioner's reading of our Opinion in *CHAMP* and further find that the factual settings of *CHAMP* and this case are distinguishable.

### B. *Substantiation*

Petitioner has failed to maintain required permanent records. He also has failed to substantiate the Vapor Room's

[18] The largest claimed expense is wages paid in cash. Petitioner opted not to specifically identify the purported recipients of these "wages." We are troubled with petitioner's claimed cash transactions and doubt that any of the claimed cash wages were ever reported as income.

expenses with the exception of those expenses respondent concedes. We decline to attempt to estimate any of his expenses pursuant to *Cohan v. Commissioner*, 39 F.2d 540, because, as discussed below, we hold that section 280E precludes any deduction of the Vapor Room's expenses. *See also Lewis v. Commissioner*, 560 F.2d 973, 977 (9th Cir. 1977) (stating that the *Cohan* rule may not be applied to certain expenses), *rev'g on other grounds* T.C. Memo. 1974–59; *Sanford v. Commissioner*, 50 T.C. 823, 827–828 (1968) (same), *aff'd*, 412 F.2d 201 (2d Cir. 1969). We hold that petitioner may not deduct any expense other than the expenses that respondent concedes. Those conceded expenses, however, must still fall outside section 280E to be deductible.

C. *Section 280E*

We now turn to section 280E. A taxpayer may not deduct any amount for a trade or business where the "trade or business (or the activities which comprise such trade or business) consists of trafficking in controlled substances * * * which is prohibited by Federal law."[19] Sec. 280E. We have previously held, and the parties agree, that medical marijuana is a controlled substance under section 280E. *See CHAMP*, 128 T.C. at 181; *see also Gonzalez v. Raich*, 545 U.S. 1 (2005); *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001).

Petitioner argues that he may deduct the Vapor Room's expenses notwithstanding section 280E because, he claims, the Vapor Room's business did not consist of the illegal trafficking in a controlled substance. He argues that the illegal trafficking in controlled substances is the only activity covered by section 280E. We disagree that section 280E is that narrow and does not apply here. We therefore reject petitioner's contention that section 280E does not apply because the Vapor Room was a legitimate operation under California law. We have previously held that a California medical marijuana dispensary's dispensing of medical marijuana pursuant to the CCUA was "trafficking" within the meaning of section 280E. *See CHAMP*, 128 T.C. at 182–183. That holding applies here with full force.

---

[19] The parties agree that sec. 280E disallows deductions only for the expenses of a business and not for its COGS. *See also Californians Helping to Alleviate Med. Problems, Inc. v. Commissioner*, 128 T.C. 173, 178 n.4 (2007).

Petitioner asserts that the Vapor Room provided caregiving services in addition to dispensing medical marijuana. He invites the Court to reinterpret section 280E more narrowly than we did in *CHAMP* to reach only those illegal underground businesses that have a single business of drug trafficking. We decline to do so. The taxpayer in *CHAMP* was a legitimate (under State law) operation that had a second business (providing caregiving services) and we applied section 280E there. The dispensing of medical marijuana, while legal in California (among other States),[20] is illegal under Federal law. Congress in section 280E has set an illegality under Federal law as one trigger to preclude a taxpayer from deducting expenses incurred in a medical marijuana dispensary business. This is true even if the business is legal under State law.

Petitioner argues alternatively that he may deduct all of the Vapor Room's expenses attributable to the Vapor Room's caregiving business. He asserts that he trafficked marijuana only during the short time it took for the staff members to pass the medical marijuana to the patrons in exchange for payment and that the rest of the Vapor Room's business was providing caregiving services. He compares his business to the medical marijuana dispensary in *CHAMP*. We found there that the taxpayer had two businesses (one the dispensing of medical marijuana and the other the providing of caregiving services). Petitioner asserts that the Vapor Room's overwhelming purpose was to provide caregiving services, that the Vapor Room's expenses are almost entirely related to the caregiving business and that the Vapor Room would continue to operate even if petitioner did not sell medical marijuana. We disagree. The record does not establish these assertions. Moreover, as previously stated, all of the testimony from petitioner and from his other witnesses was rehearsed, not impartial and not credible. We find instead that petitioner had a single business, the dispensing of medical marijuana, and that he provided all of the Vapor Room's services and activities as part of that business.

---

[20] Our research reveals for information purposes that 17 States and the District of Columbia have legalized medical marijuana as of July 19, 2012. *See* http://medicalmarijuana.procon.org/view.resource.php?resourceID=000881 (last visited July 19, 2012). Those States are Alaska, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Maine, Michigan, Montana, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont and Washington. *Id.*

The record establishes that the Vapor Room is not the same type of operation as the medical marijuana dispensary in *CHAMP* that we found to have two businesses. The differences between the operations are almost too numerous to list. The dispensary there was operated exclusively for charitable, educational and scientific purposes and its income was slightly less than its expenses. *See CHAMP*, 128 T.C. at 174, 176–177. The director there was well experienced in health services and he operated the dispensary with caregiving as the primary feature and the dispensing of medical marijuana (with instructions on how to best consume it) as a secondary feature. *See id.* at 174–175. Seventy-two percent of the *CHAMP* dispensary's employees (18 out of 25) worked exclusively in its caregiving business and the dispensary provided its caregiving services regularly, extensively and substantially independent of its providing medical marijuana. *See id.* at 175–176, 178, 183, 185. It rented space at a church for peer group meetings and yoga classes and the church did not allow marijuana on the church's premises. *See id.* at 176. It provided its low-income members with hygiene supplies and with daily lunches consisting of salads, fruit, water, soda and hot food. *See id.* at 175. Its members, approximately 47% of whom suffered from AIDS, paid a single membership fee for the right to receive caregiving services and medical marijuana from the taxpayer. *See id.* at 174–175. The names of the dispensaries are even diametrically different. The name of the dispensary there, "Californians Helping To Alleviate Medical Problems," stresses the dispensary's caregiving mission. The name of the dispensary here, "The Vapor Room Herbal Center," stresses the sale and consumption (through vaporization) of marijuana.

Petitioner essentially reads our Opinion in *CHAMP* to hold that a medical marijuana dispensary that allows its customers to consume medical marijuana on its premises with similarly situated individuals is a caregiver if the dispensary also provides the customers with incidental activities, consultation or advice. Such a reading is wrong. A business that dispenses marijuana does not necessarily consist simply of the act of dispensing marijuana, just as a business that sells other goods does not necessarily consist simply of the passing of those goods.

All facts and circumstances must be taken into account to ascertain the parameters of a business. Two activities can be separated or aggregated for tax purposes depending on the "degree of organizational and economic interrelationship * * *, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business * * *, and the similarity of * * * [the] undertakings." Sec. 1.183–1(d)(1), Income Tax Regs.; *see also Tobin v. Commissioner*, T.C. Memo. 1999–328 (listing certain factors to consider in deciding whether a taxpayer's characterization of two or more undertakings as a single activity for purposes of section 183 is unreasonable). The Commissioner usually will accept a taxpayer's characterization of several undertakings either as a single activity or as separate activities. *See* sec. 1.183–1(d)(1), Income Tax Regs. The Commissioner will reject the characterization, however, if it is artificial and cannot be reasonably supported under the facts and circumstances of the case. *See id.* A taxpayer, to be engaged in a trade or business for purposes of section 162, must be involved in the activity with continuity and regularity and the taxpayer's primary purpose for engaging in the activity must be for income or profit. *See Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987).

The facts here persuade us that the Vapor Room's dispensing of medical marijuana and its providing of services and activities share a close and inseparable organizational and economic relationship. They are one and the same business. Petitioner formed and operated the Vapor Room to sell medical marijuana to the patrons and to advise them on what he considered to be the best marijuana to consume and the best way to consume it. Petitioner provided the additional services and activities incident to, and as part of, the Vapor Room's dispensing of medical marijuana. Petitioner and the Vapor Room's employees were already in the room helping the patrons receive and consume medical marijuana and the entire site of the Vapor Room was used for that purpose. The record does not establish that the Vapor Room paid any additional wages or rent to provide the incidental services and activities. Nor does the record establish that the Vapor Room made any other significant payment to provide the incidental activities or services. Petitioner also oversaw all aspects of the Vapor Room's operation and the Vapor

Room had a single bookkeeper and a single independent accountant for its business. These facts further support our conclusion that the Vapor Room had only one trade or business. *See Tobin v. Commissioner*, T.C. Memo. 1999–328.

That petitioner may have sometimes overcharged patrons for marijuana to subsidize the cost of the Vapor Room's limited services or activities does not change our view. Petitioner's payment of the Vapor Room's expenses to dispense medical marijuana allowed the Vapor Room to fulfill its business purpose of selling medical marijuana that in turn allowed the Vapor Room to offer its incidental services and activities in support of that purpose. Moreover, the Vapor Room's only revenue was from patrons' purchase of marijuana. The Vapor Room would not have had any revenues at all (and could not have operated) if none of the patrons had purchased marijuana from petitioner. The Vapor Room did not spawn a second business simply by occasionally providing the patrons with snacks, a massage, or a movie, or allowing the patrons to play games in the room and to talk there to each other.

Petitioner also has not established that the Vapor Room's activities or services independent of the dispensing of medical marijuana were extensive. He tried to establish that they were but failed. His counsel, at trial, repeatedly asked petitioner's patrons/witnesses to describe "caregiving" services that petitioner provided at the Vapor Room. The witnesses strained to come up with any such service, other than through their rehearsed statements that fell short of establishing caregiving services of the type and extent described in *CHAMP*, 128 T.C. at 175–176. Petitioner's actions spoke loudly when he filed the tax returns for 2004 and 2005, reporting that the Vapor Room's principal business was the retail sale of "herbal" (which we understand to be marijuana). We perceive his claim now that the Vapor Room actually consists of two businesses as simply an after-the-fact attempt to artificially equate the Vapor Room with the medical marijuana dispensary in *CHAMP* so as to avoid the disallowance of all of the Vapor Room's expenses under section 280E. We conclude that section 280E applies to preclude petitioner from deducting any of the Vapor Room's claimed expenses.

VII. *Accuracy-Related Penalty*

We now turn to decide whether petitioner is liable for an accuracy-related penalty under section 6662(a). A taxpayer may be liable for a 20% penalty on any underpayment of tax attributable to negligence or disregard of rules or regulations or any substantial understatement of income tax. *See* sec. 6662(a) and (b)(1) and (2). "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code and includes "any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 6662(c); sec. 1.6662–3(b)(1), Income Tax Regs. Negligence has also been defined as a lack of due care or failure to do what a reasonable person would do under the circumstances. *See Allen v. Commissioner*, 925 F.2d 348, 353 (9th Cir. 1991), *aff'g* 92 T.C. 1 (1989). "Disregard" includes any careless, reckless or intentional disregard of rules or regulations. *See* sec. 6662(c); sec. 1.6662–3(b)(2), Income Tax Regs. An individual's understatement of income tax is substantial if the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000. *See* sec. 6662(d)(1)(A). An accuracy-related penalty does not apply, however, to any portion of an underpayment for which there was reasonable cause and where the taxpayer acted in good faith. *See* sec. 6664(c)(1).

Respondent bears the burden of production to establish that it is appropriate to impose the accuracy-related penalty. *See* sec. 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). The burden of proof is then upon petitioner (except for the increased portions of the accuracy-related penalty raised in the amendment to answer) if and once respondent meets his burden of production. *See Higbee v. Commissioner*, 116 T.C. at 447, 449. Respondent bears the burden of proof as to the increased portions of the accuracy-related penalty raised in the amendment to answer. *See* Rule 142(a)(1).

Respondent argues that petitioner is liable for the accuracy-related penalty to the extent he has understated the Vapor Room's gross receipts and failed to substantiate the Vapor Room's COGS and expenses. Petitioner's sole argument in brief is that the penalty does not apply because, he states, any inaccuracy underlying an understatement was "accidental, not substantial, and/or not negligent on the part

of the taxpayer." Petitioner asserts that the Vapor Room was his first business and that he was not instructed on the proper way to keep the books and records of a business.

We agree with respondent that the accuracy-related penalty applies in this case but disagree that it applies to the full amounts of the underpayments. Respondent concedes that petitioner substantiated $57,929 and $149,666 of the Vapor Room's reported expenses for 2004 and 2005, respectively. We nonetheless disallowed the deduction of those expenses under section 280E. The application of section 280E to the expenses of a medical marijuana dispensary had not yet been decided when petitioner filed his Federal income tax returns for 2004 and 2005. The accuracy-related penalty does not apply, therefore, to the portion of each underpayment that would not have resulted had petitioner been allowed to deduct his substantiated expenses. *Cf. Van Camp & Bennion v. United States*, 251 F.3d 862, 868 (9th Cir. 2001) ("Where a case is one 'of first impression with no clear authority to guide the decision makers as to the major and complex issues,' a negligence penalty is inappropriate[.]" (quoting *Foster v. Commissioner*, 756 F.2d 1430, 1439 (9th Cir. 1985), *aff'g in part and vacating as to an addition to tax for negligence* 80 T.C. 34 (1983))).

The accuracy-related penalty does apply, however, to the remainder of each underpayment because those portions of the underpayments are attributable to negligence.[21] Petitioner consciously opted not to keep adequate books and records and that action was in reckless or conscious disregard of rules or regulations. *See Higbee v. Commissioner*, 116 T.C. at 449. He also did not record or report any of the Vapor Room's gross receipts for approximately the first six months of its business. He also initially gave respondent's revenue agent one set of documents (the Ehardt GL and the Ehardt P&L) that does not correspond with the ledgers he now relies upon. Our decision to find petitioner liable does not change even though the Vapor Room may have been petitioner's first business or he was not "instructed" on the proper way to keep books. The Code requires that taxpayers who decide to go into business for themselves maintain suffi-

---

[21] The underpayments also appear to be "substantial" within the statutory definition of that word. The accuracy-related penalty will also apply to the referenced portions of the underpayments if that definition is met.

cient records to substantiate their income and expenditures. A reasonable person would have sought to comply with this requirement. We sustain respondent's determination (as supplemented through the amendment to answer but as we modify) that petitioner is liable for the penalty for each year.

## VIII. *Epilogue*

We have considered all arguments that the parties made and have rejected those arguments not discussed here as without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*