T.C. Memo. 2018-83

UNITED STATES TAX COURT

LAUREL ALTERMAN AND WILLIAM A. GIBSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13666-14.                    Filed June 13, 2018.

<u>Henry G. Wykowski</u> and <u>Matthew A. Williams</u>, for petitioners.

<u>Cameron W. Carr</u>, <u>Kaelyn J. Romey</u>, and <u>Luke D. Ortner</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The petitioners, Laurel Alterman and William A.
Gibson, filed joint income-tax returns for 2010 and 2011.  On March 13, 2014, the
respondent (hereinafter, the "IRS") issued a notice of deficiency to Alterman and
Gibson.  The notice of deficiency made adjustments to the income of a Colorado
medical-marijuana business, owned by Alterman, income that was reported on

[*2] Schedules C, "Profit or Loss From Business", of both returns. The IRS

determined the following income-tax deficiencies and accuracy-related penalties

under section 6662(a) for tax years 2010 and 2011.[1]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|------------|----------------------|
| 2010 | $157,821 | $31,564 |
| 2011 | 233,421 | 46,684 |

Alterman and Gibson filed a petition under section 6213(a) for redetermination of

the deficiencies for both years. We have jurisdiction under section 6214(a).[2]

After taking into account concessions by the parties described later in the opinion,

here are the issues remaining for decision:

1.  What are the amounts of deductible business expenses for Alterman's

    medical-marijuana business for tax years 2010 and 2011? We hold that

    petitioners are not entitled to any business-expense deductions. See infra

    Part I.

_____

[1]Unless otherwise indicated, all references to sections are to the Internal Revenue Code of 1986, as amended, and all references to Rules are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

[2]Alterman and Gibson resided in Colorado when they timely filed the petition. Therefore, any appeal of our decision in this case would go to the U.S. Court of Appeals for the Tenth Circuit unless the parties designate the Court of Appeals for another circuit. See sec. 7482(b)(1) and (2).

[*3] 2. Are Alterman and Gibson entitled to cost-of-goods-sold allowances for the medical-marijuana business in excess of the amounts conceded by the IRS in its briefs for tax years 2010 and 2011? The conceded amounts are $452,292 for 2010 and $232,772 for 2011. We hold that they are not entitled to additional allowances. See infra Part II.

3. Are Alterman and Gibson liable for accuracy-related penalties under section 6662(a) for tax years 2010 and 2011? We hold that they are liable. See infra Part III.

FINDINGS OF FACT

The parties stipulated some facts, and those facts are incorporated by reference. At all times during 2009, 2010, and 2011 Alterman and Gibson were married and resided in Colorado. They filed joint returns for these years.

Setting Up Altermeds, LLC

During the years at issue, it was not illegal under Colorado law for people to use marijuana medically and for a medical-marijuana business to sell marijuana. See Colo. Const. art. XVIII, sec. 14. However, both activities were illegal under federal law.[3] In July 2009, Alterman incorporated Altermeds, LLC.[4] She was its

---

[3]Under federal law, marijuana is classified as a Schedule I controlled substance under the Controlled Substances Act. Pub. L. No. 91-513, secs. 102,

(continued...)

**[*4]** sole owner during 2009, 2010, and 2011. Altermeds, LLC, was a separate entity under Colorado law. For federal tax purposes, it is a disregarded entity, meaning that it is treated as a sole proprietorship of Alterman. See sec. 301.7701-2(a), Proced. & Admin. Regs.

Operation of the Medical-Marijuana Dispensary

Around September 2009, Altermeds, LLC, opened a retail store under the business name "Altermeds". We refer to this retail store as the "dispensary". The dispensary was in Louisville, Colorado, which is near Boulder, Colorado. The dispensary had regular operating hours of Monday through Saturday from 11 a.m. to 7 p.m., and on Sunday from 12 p.m. to 5 p.m.

The dispensary sold smokable marijuana, either as prerolled marijuana cigarettes (i.e., joints) or as dried marijuana buds. It also sold marijuana in edible form, such as brownies and cakes, and orally-consumed tinctures[5]. We refer to

---

[3](...continued)
202, 401, 84 Stat. at 1242, 1247, 1260 (1970) (codified as amended at 21 U.S.C. secs. 802, 812, 841 (2012)).

[4]Before she started Altermeds, LLC, Alterman worked as a real estate agent. She continued to work as a real estate agent even while owning and working at Altermeds, LLC.

[5]A marijuana tincture is a liquid containing marijuana and is consumed orally, for example, by adding tincture drops to tea.

**[\*5]** Altermeds, LLC's merchandise that contained marijuana, in any of the types of products mentioned above, as its "marijuana merchandise".

During 2010 and 2011, the dispensary also sold products that contained no marijuana, such as pipes, papers, and other items used to consume marijuana. We refer to this type of merchandise as the "non-marijuana merchandise". In 2009, 2010, and 2011 Altermeds, LLC, acquired all of its non-marijuana merchandise from third-party sellers.

Altermeds, LLC, did not provide any services.

Alterman shared the management responsibilities for the dispensary with her son, Jack Alterman. Jack worked at the dispensary during the years at issue. It was he who usually made the decisions concerning the purchase of marijuana and non-marijuana merchandise.[6] Alterman was responsible for Altermeds, LLC's recordkeeping and finances, such as making bank deposits, paying for merchandise, and paying expenses.

---

[6]Jack did not work for Altermeds, LLC, continuously during the years at issue. The record is not clear when Jack was not working for Altermeds, LLC, and who handled merchandise purchases during his absence.

[*6] Purchases and Production of Marijuana Merchandise By Altermeds, LLC

During 2009, Altermeds, LLC, did not grow or produce any of its marijuana merchandise. It bought all of its marijuana merchandise during that year exclusively from third parties.

During 2010, Altermeds, LLC, continued to acquire marijuana merchandise from third-party sellers.

Effective September 2010, Colorado required medical-marijuana businesses to grow at least 70% of the marijuana they sold. Colo. Rev. Stat. sec. 12-43.3-103(b)(2) (2010). Anticipating this 70% requirement, Altermeds, LLC, began renting a warehouse in June 2010 to grow its own marijuana. The warehouse, which was in Boulder, was referred to as the "grow site". When Altermeds, LLC, first rented the warehouse, the warehouse needed modifications before it could produce marijuana. Altermeds, LLC, hired Michael Boughton and Tiffany Weaver in June 2010 to make the necessary modifications. Boughton was a person who had previously sold marijuana merchandise to Altermeds, LLC. In September 2010, Altermeds, LLC, also hired Joseph Ingoglia to assist with the grow site. The only employees who worked at the grow site during 2010 were Boughton, Weaver, and Ingoglia.

**[\*7]**   While the grow site was being modified, Boughton and Weaver agreed to sell marijuana merchandise to Altermeds, LLC, on credit, pursuant to an oral agreement with Alterman.  In 2010, marijuana was grown in tents in the warehouse while the grow site was being modified.  The record is unclear as to whether the marijuana grown in the tents in 2010 was owned by Boughton and Weaver (who then sold it to Altermeds, LLC, on credit) or by Altermeds, LLC.  It is also unclear whether any of the marijuana grown in the tents during 2010 was transferred to the dispensary in 2010.

During 2010, Altermeds, LLC, made payments to Boughton, Weaver, and Ingoglia.  The payments to Ingoglia were treated as wage payments by Altermeds, LLC.  The payments to Boughton and Weaver included payments treated by Altermeds, LLC, for federal tax purposes as wage payments and included payments not so treated.

In 2011, Altermeds, LLC, continued to purchase marijuana merchandise from third-party sellers.  It is unclear whether Altermeds, LLC, purchased marijuana from Boughton and Weaver during 2011.  From January until May 2011, Altermeds, LLC, made payments to Boughton and Weaver.  All of these payments were treated as wage payments for federal tax purposes by Altermeds,

[*8] LLC, although the record does not allow us to say how much of the payments were actually for Boughton's and Weaver's services as employees.

Around May 2011, the Colorado Medical Marijuana Board certified that Altermeds, LLC's grow site met the structural and mechanical requirements for marijuana cultivation facilities. Altermeds, LLC, fired Boughton and Weaver around the same time. Boughton and Weaver credibly testified that when they were fired, Altermeds, LLC, still owed them for marijuana that they had sold Altermeds, LLC, on credit. The record does not allow us to calculate the exact amount owed. Ingoglia continued to work at the grow site for some time after April 2011 but ended his employment with Altermeds, LLC, before the end of 2011. After Ingoglia stopped working for Altermeds, LLC, it is unclear which Altermeds, LLC employees worked at the grow site.

Employees of Altermeds, LLC

In 2010 and 2011, Altermeds, LLC, employed Boughton, Weaver, Ingoglia, and others. The following table summarizes the Forms W-2, "Wage and Tax Statement", issued by Altermeds, LLC, for the years at issue:

| Employee | 2011 | 2012 |
|---|---|---|
| Jack Alterman | $10,800 | $32,000 |
| Robert Des Plaines | 33,620 | 48,450 |
| Samuel Feliciano | 13,738 | 8,788 |
| Nathan Leake | 15,204 | 26,100 |
| Noelle Sherman | 7,024 | 5,980 |
| Michael Boughton | 10,000 | 24,250 |
| Tiffany Weaver | 2,000 | 24,250 |
| Joseph Ingoglia | 2,800 | 25,000 |
| Chad Terry | 0 | 4,829 |
| Adam Locy | 0 | 8,745 |
| Jessica Cole | 0 | 9,466 |
| Laurel Alterman | 0 | 14,500 |
| Total | 95,186 | 232,358 |

The record confirms that Altermeds, LLC, made payments in these amounts to these persons. The record does not allow us to say how much of these payments was actually for these persons' services as employees. The overall amounts reported on the Forms W-2 as wages equal the wage deductions reported on Altermeds, LLC's Schedules C: $95,186 in 2010 and $232,358 in 2011.

Some employees worked at the dispensary, some worked at the grow site, and some worked at both. Employees at the dispensary sold marijuana merchandise and non-marijuana merchandise. According to Alterman, employees at the dispensary also engaged in the "trimming" of marijuana. "Trimming" is the process of removing stems, seeds, and twigs from a marijuana plant to convert

[*10] marijuana to final, salable form. Alterman estimated that of the time spent by any particular employee at the dispensary, 40% of that time was occupied by trimming. We do not believe that employees working at the dispensary spent substantial time trimming because (1) no evidence other than Alterman's testimony supports the assertion that employees working at the dispensary trimmed marijuana and (2) other witnesses credibly testified that no trimming took place at the dispensary.

Neither Altermeds, LLC employees nor Alterman recorded the hours worked by particular employees at the grow site versus the dispensary. Given the lack of information in the record, we cannot determine what part of the payments treated by Altermeds, LLC, as employee wages was paid for work performed at the grow site versus the dispensary.

Records of Altermeds, LLC

During examination, Alterman provided the IRS with receipts that corroborated some of the expenses paid by Altermeds, LLC, and some of the purchases of merchandise made by Altermeds, LLC.[7] None of these receipts are in the record.

---

[7]The record does not reveal whether the receipts for purchases of merchandise given by Alterman to the IRS were receipts for non-marijuana merchandise or marijuana merchandise or both.

[*11] The record contains Altermeds, LLC's general ledger for 2010 and 2011.

We first discuss the notations made in the general ledger for purchases of marijuana and non-marijuana merchandise. We refer to these notations as "purchase notations". For each purchase of merchandise, the general ledger recorded (1) the date, (2) the dollar amount, and (3) the method of payment. Each purchase of merchandise was given one of four types of descriptions in the general ledger: (1) smokable, for marijuana buds and pre-rolled joints; (2) edible, for food items, tinctures, and other infused items; (3) non-marijuana, for papers and other paraphernalia; and (4) a fourth grouping mysteriously labeled "Meds-C" (hereinafter, the "undefined merchandise"). The record is unclear as to whether the undefined merchandise contained marijuana. Sometimes the identity of the seller was noted in the purchase notation; sometimes it was not. The general ledger aggregated the total amounts paid for merchandise purchases in a year in each of the four descriptive categories of merchandise. The general ledger also aggregated the total amounts paid for all merchandise purchases in a year.

The general ledger tracked the dispensary's daily receipts in the same four merchandise categories as the purchase notations. The general ledger does not reflect the dollar amount of each particular transaction. According to the gross receipts in the 2010 general ledger, Altermeds, LLC, derived 86.5% of its gross

[*12] receipts from smokable marijuana merchandise, 8.6% from edible marijuana merchandise, 1.4% from non-marijuana merchandise, and 3.6% from the undefined merchandise. For 2011, the percentages are 81.7% from smokable marijuana merchandise, 14.2% from edible marijuana merchandise, 3.6% from non-marijuana merchandise, and 0.6% from the undefined merchandise.

We now discuss the notations made in the general ledger with respect to expenses (as distinguished from the purchase of merchandise). For each payment of an expense, the general ledger shows (1) the date, (2) the dollar amount, (3) the type of expense (e.g., utilities, rent, etc.), (4) the payment method (i.e., cash, check, credit card, or electronic funds transfer), and (5) sometimes, the identity of the payee.

Altermeds, LLC, paid its expenses, and paid for its merchandise, through various alternative methods: (1) checks from three checking accounts written directly to vendors, (2) checks from one of three checking accounts (i.e., the dispensary account, as described below) to Jack, who then paid cash to the vendor, (3) electronic funds transfers from the three checking accounts, (4) a Visa credit card, (5) cash paid out of the cash register at the dispensary, or (6) cash paid from an unknown source.

As discussed above, checks were written from three checking accounts.

[*13] The first checking account was often used to pay the expenses of the dispensary and for merchandise purchases. We refer to this checking account as the dispensary account. Checks were written from this account during both 2010 and 2011. The record contains check-register entries for the checks written during 2010. The record contains check-register entries for some, but not all, of the checks written during 2011. The information in each check-register entry included the date and the amount of the check. For checks written for merchandise purchases, the check-register entries also sometimes showed the payees. For checks written for smokable marijuana, the check-register entries also sometimes showed the strains and weights of marijuana purchased. For checks written for edibles and non-marijuana merchandise, the check-register entries also sometimes showed the quantities purchased. For checks written to pay expenses (as distinguished from the purchases of merchandise), the check-register entries also showed the general purposes of the payments (e.g., "Costco - supplies"), and sometimes showed the payees.

The second checking account was often used to pay the costs of the grow site and also for merchandise purchases. We refer to this second checking account as the grow-site account. Although checks were written from this account in 2010 and 2011, there is no check register in the record for this account.

[*14] The third checking account was first used in December 2011. It was sometimes used to pay expenses and also for merchandise purchases. No check register is in the record for this account.

In both years at issue, some merchandise purchases and expenses were paid with electronic funds transfers, made from all three checking accounts.

The record contains banks statements for all three checking accounts. For the dispensary account, the bank statements cover January 2010 to December 2011. For the grow-site account, the bank statements cover the period from when the account was opened, June 2010, until December 2011. For the third account, the bank statements cover December 2011, which is when the account was first used. The bank statements contain entries corresponding to all checks written from the three accounts during 2010 and 2011. The bank statements contain entries corresponding to all electronic funds transfers from all three accounts during 2010 and 2011.

For electronic funds transfers, the bank statements show the date of each transfer, the amount of the transfer, and the payee. This set of information is not more detailed than the corresponding information in the general ledger for the identical electronic funds transfers. A number of entries recorded in the 2011 general ledger as purchases of smokable marijuana merchandise were paid with

[*15] electronic funds transfers. For some of these entries, the payees were home improvement stores, such as Home Depot or Lowe's. We find it improbable that these stores sold smokable marijuana to Altermeds, LLC.

In both years at issue, some merchandise purchases were made with cash taken from the dispensary's register. Altermeds, LLC, kept a daily sales record for its dispensary. In addition to recording gross receipts (on a daily basis), this daily sales record noted the amount of cash taken from the register for merchandise purchases and classified the purchased merchandise into one of the four merchandise categories. Occasionally additional details concerning the purchased merchandise were recorded on the daily sales record.[8]

Some edible marijuana merchandise was purchased during 2011 using cash. The source of the cash is unclear.

Some merchandise was purchased during 2010 by Jack, using cash that he acquired when Alterman wrote a check to him. Merchandise was purchased in this way when the third-party seller did not wish to receive a check. It appears

---

[8]The additional information for these merchandise purchases was no greater in detail than what Alterman noted in the most detailed check-register entries for purchases of merchandise (i.e., those check-register entries in which Alterman noted the strains and weights for smokable marijuana merchandise, and the unit quantities for edible marijuana and non-marijuana merchandise).

[*16] that the checks used in such an intermediary purchase were drawn from the dispensary account and were recorded in the check register.

In 2010 and 2011, Altermeds, LLC, used a Visa credit card to pay some of its expenses and for merchandise purchases. The credit card statements (hereinafter, the "Visa statements") in the record were incomplete, as pages were missing for both years. Alterman wrote on the Visa statements descriptions of the categories of some of the expenses. Either Alterman or Mark Pendleton, Altermeds, LLC's bookkeeper, went through the Visa statements and aggregated certain expenses or merchandise purchases into single sums. These sums were then transferred to the general ledger. Thus, for these sums, the general ledger entries are not specific to particular payments, but rather a group of payments. Pendleton used Alterman's initial categorizations of Visa card charges when he transferred the amounts to the expense or merchandise purchase categories in the general ledger.

As discussed above, the dispensary used daily sales records that tracked its gross receipts. Alterman gave the daily sales records to Pendleton to enter into the general ledger. Pendleton used the daily sales records to prepare monthly statements, but these monthly statements are not in the record. To prepare the general ledger, Pendleton relied on documents that Alterman provided to him,

[*17] including daily sales records, Visa statements, and receipts. (It is unclear whether Alterman provided Pendleton with bank statements. It appears that Alterman did provide Pendleton with some deposit slips, i.e., records given to Alterman by the bank when Alterman made a particular deposit. However, no deposits slips are in the record.) Alterman herself did not verify whether the gross receipts in the general ledger were consistent with the amounts stated in the daily sales records.

Tax Reporting

The income of Altermeds, LLC, was reported on Schedules C attached to Alterman and Gibson's 2010 and 2011 joint returns.

For 2010, the Schedule C reported gross receipts of $894,922. The Schedule C reduced gross receipts by cost of goods sold of $464,119. The Schedule C also reported business-expense deductions of $385,489.

For 2011, the Schedule C reported gross receipts of $657,126. The Schedule C reduced gross receipts by cost of goods sold of $253,089. The Schedule C also reported business-expense deductions of $384,817.

The Schedules C reported that cost of goods sold for each year at issue (and 2009) was computed as follows:

| [*18] | 2009 | 2010 | 2011 |
|---|---|---|---|
| Inventory at beginning of year | 0 | 0 | 0 |
| + Purchases less cost of items withdrawn for personal use | $72,564 | $476,398 | $253,089 |
| + Cost of labor | 0 | 0 | 0 |
| + Materials and supplies | 0 | 0 | 0 |
| − Inventory at end of year | 0 | 12,279 | 0 |
| = Cost of Goods Sold | 72,564 | 464,119 | 253,089 |

The Schedules C reported that Altermeds, LLC's income had been calculated using the cash method of accounting.

For the 2009 tax year, the first year that Altermeds, LLC, was in business, Alterman and Gibson's tax return was prepared by Pendleton.[9] Pendleton also served as Altermeds, LLC's bookkeeper during 2009. Pendleton had been preparing returns for Alterman and Gibson in years before 2009.

For the 2010 tax year, Alterman decided instead to use the services of Comiskey & Co. (hereinafter, "Comiskey") to prepare the return.[10] Comiskey was recommended to Alterman by Jill Lameroux, another medical-marijuana business owner. Alterman reviewed the 2010 return before signing it.

---

[9] Pendleton attached a separate Schedule C for tax year 2009 to report the expenses and income of Alterman's real estate agent business.

[10] Comiskey attached a separate Schedule C for tax year 2010 to report the expenses and income of Alterman's real estate agent business.

[*19] For Comiskey's use in preparing the 2010 return, Alterman provided the firm with a profit and loss statement and a balance sheet for Altermeds, LLC.[11] She did not provide Comiskey with other records, such as the general ledger or receipts. Comiskey apparently used the profit and loss statement and the balance sheet to report the various items of cost of goods sold on the Schedule C for 2010.[12] In particular:

- $464,119 Total Cost of Goods Sold for 2010. It appears that Comiskey transferred the profit and loss statement entry "Total Cost of Goods Sold", in the amount of $464,119, to the 2010 Schedule C line item for cost of goods sold, in the same amount. The entry "Total Cost of Goods Sold" in the profit and loss statement, in the amount of $464,119, was composed of four subtotals for each of the four merchandise categories used in the purchase notations in the general ledger. The record does not reveal how the profit and loss statement computed the subtotals in each of the four merchandise categories.

[11]The record does not reveal who prepared the profit and loss statement or the balance sheet or what information was used to prepare these two documents.

[12]The record includes the profit and loss statement and balance sheet for tax year 2010. No such documents appear in the record for tax years 2009 and 2011, and we believe there were no such documents for those years.

[*20]  ● $0 Beginning Inventory for 2010. It is unclear how Comiskey determined the $0 value reported on the 2010 Schedule C for beginning inventory. The balance sheet for 2010 reflects only one inventory amount, "Total Inventory", which is presumably the ending inventory for 2010. (As explained below, this amount was composed of subtotals.)

● $12,279 Ending Inventory for 2010. It appears that Comiskey transferred the entry in the balance sheet, "Total Inventory", in the amount of $12,279, to the 2010 Schedule C line item for inventory at the end of the year, in the same amount. The entry "Total Inventory" in the balance sheet, in the amount of $12,279, was composed of three subtotals for smokable marijuana ($9,592), edible marijuana ($1,275), and non-marijuana merchandise ($1,412). It further appears that the balance sheet entry of $12,279 for "Total Inventory" corresponds to the same named entry, with the same dollar amount, in the 2010 general ledger (to which Comiskey did not have access). The 2010 general ledger entry "Total Inventory" was made up of five subtotals: smokable marijuana of $9,592; edible marijuana of $1,275; non-marijuana merchandise of $1,412; undefined merchandise of $0;

and another category, "Inventory - Other", of $0.  We are unable to trace the documentary source for the $12,279 amount, or its subtotals, found in both the general ledger and the balance sheet.  It appears that these amounts ultimately came from an yearend inventory done by Alterman, who testified that she generally performed a physical inventory at the end of each year and documented her inventory count on paper.[13]  The record does not reveal whether Alterman assigned cost values to the unit quantities in the physical inventory; even if she did so, the record does not give us any information about the cost she assigned to any particular unit in inventory or how she assigned cost to any particular unit for any unit of purchased marijuana and non-marijuana merchandise or self-grown marijuana merchandise.  Indeed the record does not have any physical inventory that Alterman committed to paper.

- $476,398 Purchase Costs for 2010.  The record is unclear as to how the $476,398 amount on the 2010 Schedule C for purchase costs of

---

[13]A physical inventory is a list of the types of products on hand and unit quantities of each type of product at a given time.

[*22]     merchandise was computed.[14]  We note that the aggregated sum of "Total Inventory" ($12,279) from the balance sheet and "Total Cost of Goods Sold" ($464,119) from the profit and loss statement equals the dollar amount for purchase costs of merchandise on the 2010 Schedule C ($476,398).

For the 2011 return, Alterman decided to have Pendleton prepare the return instead of Comiskey.[15]  Alterman's decision to go back to Pendleton was motivated by the fact that Comiskey had charged Alterman significantly more for preparing the 2010 return than Pendleton had charged for the 2009 return.  Also Pendleton told Alterman he had experience preparing returns for other medical-marijuana businesses.  After Pendleton prepared the 2011 return, Alterman reviewed it.  During 2011, Pendleton continued to work as Altermeds, LLC's bookkeeper (as he had during 2010, even though he had not prepared the 2010 return).  As part of his bookkeeping duties for 2011, he continued to prepare monthly statements from documentation Alterman provided to him.  He also

---

[14]The 2010 general ledger contains a line item ("Total Cost of Goods Sold") that appears analogous to the tax-return line item under which the $476,398 amount appears.  However, the general-ledger item is a different amount, $473,485.

[15]Pendleton attached a separate Schedule C for tax year 2011 to report the expenses and income of Alterman's real estate agent business.

[*23] created the 2011 general ledger. The 2011 general ledger bizarrely recorded that "Total Inventory" was $12,279, which was the same dollar amount recorded in the "Total Inventory" entry in the 2010 ledger. The 2011 general ledger also showed five subtotals. The 2011 general ledger's description of each subtotal, and the dollar amount of each subtotal, were the same as in the 2010 general ledger.

We are uncertain why the 2011 Schedule C reported $0 as the beginning and ending inventories for 2011. That would mean, implausibly, that Altermeds, LLC, had no merchandise on hand at the beginning and end of 2011. As for the $253,089 reported on the 2011 Schedule C for purchase costs, we are unsure where this amount came from. The analogous entry in the 2011 general ledger recorded the amount as $217,089.

Audit and Statutory Notice of Deficiency

In 2012, the IRS examined Alterman and Gibson's 2010 and 2011 returns. It focused exclusively on Altermeds, LLC's Schedules C. Revenue Agent Kelly Tipton (hereinafter, "RA Tipton") was the principal revenue agent who examined the returns. Alterman provided RA Tipton with documents, such as receipts and daily sales records.

The notice of deficiency determined that Altermeds, LLC, underreported gross receipts by $24,663 and $8,359 for 2010 and 2011, respectively. The notice

[*24] allowed costs of goods sold of $388,231 and $1,021 for tax years 2010 and 2011, respectively. Furthermore, the notice disallowed all of Altermeds, LLC's Schedule C business-expense deductions for tax years 2010 and 2011 on section 280E grounds, except for depreciation and section 179 expenses in the amounts of $49,671 and $719 for tax years 2010 and 2011, respectively.

The notice also determined accuracy-related penalties under section 6662(a). RA Tipton made the initial determination to impose accuracy-related penalties. The determination was approved by RA Tipton's supervisor, Tommy D. McDonald. Both the initial determination and the approval of the initial determination were made before the notice of deficiency was mailed.

Conceded Issues

In the petition, Gibson sought innocent-spouse relief from joint and several liability for the deficiencies and penalties in the notice of deficiency. At trial, Gibson conceded his claim for innocent-spouse relief for both years at issue. At trial, Alterman and Gibson conceded that Altermeds, LLC, underreported its gross receipts in the amounts stated in the notice of deficiency.

In the IRS's brief, the IRS increased the amounts of cost of goods sold it conceded for 2010 from $388,231 in the notice of deficiency to $452,292 and for 2011 from $1,021 to $232,772. The IRS's brief stated that, for tax year 2010, the

[*25] amount conceded in excess of the cost-of-goods-sold allowance in the notice of deficiency was made up of the following: $9,580 for rent for the grow site; $2,010 for utilities at the grow site; $49,671 for depreciation and section 179 expenses (the same amount allowed as a deduction in the notice); and $2,800 for wages.[16] The IRS's brief stated that, for tax year 2011, the amount conceded in excess of the cost-of-goods-sold allowance in the notice of deficiency was made up of the following: $22,407 for rent for the grow site; $10,207 for utilities at the grow site; $719 for depreciation and section 179 expenses (the same amount allowed as a deduction in the notice); $25,000 for wages; $295 for testing of marijuana; and $173,123 for purchases of merchandise.[17]

## OPINION

The taxpayer bears the burden of proving, by a preponderance of the evidence, that the IRS's determinations in the notice of deficiency are incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987). This is the burden of persuasion. Alterman and Gibson concede that they have the burden of persuasion. With

---

[16]The sum of these amounts ($9,580 + $2,010 + $49,671 + $2,800) and $388,231 is $452,292.

[17]The sum of these amounts ($22,407 + $10,207 + $719 + $25,000 + $295 + $173,123) and $1,021 is $232,772.

[*26] respect to certain issues involving liability for penalties, the IRS has the burden of production. This is described in greater detail infra Part III.

I.    Business-Expense Deductions

Section 162 allows a deduction for the expenses of carrying on a business. Sections 167 and 179 allow deductions for depreciation of assets used in a business. Section 280E, however, provides that no deduction is allowed for an amount paid or incurred in carrying on a business if the business consists of trafficking in controlled substances. Although Alterman and Gibson concede that Altermeds, LLC, trafficked in controlled substances, they contend that it had a separate business of selling non-marijuana merchandise and that the business-expense deductions of this separate business are not disallowed by section 280E. Whether selling non-marijuana merchandise was a separate business from selling marijuana merchandise is an issue of fact that depends on, among other things, the degree of economic interrelationship between the two activities. See Californians Helping to Alleviate Med. Problems, Inc. v. Commissioner (CHAMP), 128 T.C. 173, 183 (2007). Under the circumstances, we hold that selling non-marijuana merchandise was not separate from the business of selling marijuana merchandise. First, Altermeds, LLC, derived almost all of its revenue from marijuana merchandise. Second, the types of non-marijuana products that it sold (pipes and

[*27] other marijuana paraphernalia) complemented its efforts to sell marijuana.[18]

Altermeds, LLC, had only one unitary business, selling marijuana. See Canna

Care, Inc. v. Commissioner, T.C. Memo. 2015-206, at *12, aff'd, 694 F. App'x

570 (9th Cir. 2017).

If, however, selling non-marijuana merchandise were considered a separate

business, then the expenses of that business would be deductible. See CHAMP,

128 T.C. at 183-185 (stating that caregiving services were a business separate

from provision of marijuana; expenses of providing caregiving services were

deductible). Alterman and Gibson argue that these deductible expense are

$54,707.03 in 2010 and $57,517.93 in 2011. These amounts are equal to 40% of a

list of subtotals in a table in the brief filed by Alterman and Gibson after trial.

Each subtotal bears a vague description, for example "Non-COGS Utilities".

---

[18]Besides marijuana paraphernalia, Alterman testified that the dispensary also sold (1) hats and T-shirts with the name and business logo of Altermeds, LLC, (2) magazines about marijuana, (3) and chicken soup. No documentary evidence corroborates the existence or extent of these sales. On a preponderance of evidence, we find that no such items were sold. Furthermore, these types of products as described by Alterman would generally complement the sales of marijuana by the dispensary. For example, the hats and T-shirts as described by Alterman bore the name and business logo of Altermeds, LLC. Thus, even if Altermeds, LLC, sold such hats and T-shirts, selling those items would have helped advertise medical marijuana.

**[*28]** However, the brief fails to adequately explain why any portion of those subtotals is deductible.  In particular the brief fails to:

- identify any specific payments that make up these subtotals;

- provide record citations to support these subtotals; and

- propose findings of facts regarding these subtotals.

Alterman and Gibson's argument regarding the amounts of business-expense deductions attributable to a putative second business was not briefed properly. See Rule 151(e)(3) (brief must include proposed findings of fact with references to the record); Rule 151(e)(5) (brief must include arguments regarding any disputed questions of fact).  Even if we thought that the sale of non-marijuana merchandise was a separate business, Alterman and Gibson's failure to properly brief the amount of deductions that would be attributable to this business would preclude us from allowing any deductions for the separate business.[19]

We now consider whether Alterman and Gibson are entitled to any business-expense deductions for Altermeds, LLC, apart from the amounts of

---

[19]Although, under the rule in Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), the Court can estimate the amount of deductible expenses if there is a reasonable basis for making such an estimate, Alterman and Gibson do not contend the Court should employ the Cohan rule to estimate the business expenses of the putative second business.  Furthermore, their brief fails to point to any evidence that would provide the reasonable basis required for the Court to make an estimate under the Cohan rule.

**[\*29]** business-expense deductions allegedly attributable to the putative second business. Because we consider Altermeds, LLC's business to consist of trafficking in controlled substances, all such deductions are disallowed by section 280E. Furthermore, Alterman and Gibson, having failed to properly brief their entitlement to deductions for business expenses they claim relate to Altermeds, LLC's putative second business, have also failed to properly brief their entitlement to deductions for any other business expenses of Altermeds, LLC. They did not even allege the amounts of such deductions, much less any specific payments, provide record citations, or propose findings of fact. Therefore, we conclude Alterman and Gibson are not entitled to any business-expense deductions for Altermeds, LLC.[20]

---

[20]This conclusion holds even for depreciation and sec. 179 expenses. Alterman and Gibson claimed deductions of $119,639 for 2010 and $11,739 for 2011 for depreciation and sec. 179 expenses and, as discussed above, the notice of deficiency partially allowed deductions for depreciation and sec. 179 expenses ($49,671 and $719 for 2010 and 2011, respectively). In their post-trial brief, Alterman and Gibson argue that they are entitled to deduct business expenses for a second business that did not consist of trafficking in controlled substances, but they do not identify among these business expenses any depreciation and sec. 179 expenses. Furthermore, they argue that the deductions they claimed for depreciation and sec. 179 expenses on their Schedules C for 2010 and 2011 should be recharacterized as allowances for cost of goods sold of Altermeds, LLC, in its business of trafficking in controlled substances. The IRS argues in its post-trial brief that sec. 280E disallows all business-expense deductions (including depreciation and sec. 179 expenses) for Altermeds, LLC. Furthermore, it

(continued...)

**[*30]** II.     <u>Cost of Goods Sold</u>

Alterman and Gibson argue they are entitled to cost-of-goods-sold allowances in excess of the amounts the IRS conceded in its briefs.  The individual income tax is computed on the basis of taxable income.  Sec. 1.  Taxable income is equal to gross income minus deductions.  Sec. 63.  Cost of goods sold is a reduction made in the course of computing gross income.  Sec. 1.61-3(a), Income Tax Regs.  It is not a deduction, see <u>Max Sobel Wholesale Liquors v. Commissioner</u>, 69 T.C. 477 (1977), <u>aff'd</u>, 630 F.2d 670 (9th Cir. 1980), and therefore it is not disallowed by section 280E, <u>Olive v. Commissioner</u>, 139 T.C. 19, 32 (2012), <u>aff'd</u>, 792 F.3d 1146 (9th Cir. 2015); sec. 1.162-1(a), Income Tax Regs.

As the taxpayers, Alterman and Gibson must prove the amounts allowable as cost of goods sold.  <u>See</u> Rule 142(a).  A taxpayer is required to maintain

_____

[20](...continued)
concedes that Alterman and Gibson are entitled to cost-of-goods-sold allowances in the amounts allowed in the notice of deficiency for depreciation and sec. 179 expenses and that the amounts are additional to the allowances for cost of goods sold allowed in the notice of deficiency.  Because Alterman and Gibson failed to brief their entitlement to deductions for business expenses related to Altermeds, LLC, including depreciation and sec. 179 expenses, and because they argue that the amounts of deductions they reported for depreciation and sec. 179 expenses should be recharacterized as cost of goods sold, they have waived any argument that they are entitled to the deductions allowed by the notice of deficiency for depreciation and sec. 179 expenses.

**[*31]** sufficient permanent records to substantiate income, including cost of goods sold. See sec. 6001; sec. 1.6001-1(a), (d), Income Tax Regs. However, the Court may estimate cost of goods sold under a variation of the Cohan rule even when cost of goods sold is not fully substantiated, provided that there is a reasonable basis for making such an estimate. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); Vanicek v. Commissioner, 85 T.C. 731, 743 (1985); see Olive v. Commissioner, 139 T.C. at 34.

Properly computed, cost of goods sold equals

- the cost of merchandise on hand at the beginning of the taxable year ("beginning inventory"), sec. 1.471-3(a), Income Tax Regs.,

- plus the cost of merchandise purchased since the beginning of the taxable year ("purchase costs"), id. para. (b),

- plus the direct and indirect cost of producing merchandise ("production costs"), id. para. (c), sec. 1.471-11, Income Tax Regs.,

- minus the cost of inventory on hand at the end of the tax year ("ending inventory"), sec. 1.471-1, Income Tax Regs.

[*32] Inventories must be recorded in a legible manner, properly computed and summarized, and these inventory records must be preserved by the taxpayer. Sec. 1.471-2(e), Income Tax Regs.[21]

Alterman and Gibson contend that the cost-of-goods-sold allowances for 2010 and 2011 are:

|  | 2010 | 2011 |
|---|---|---|
| Cost of merchandise purchased during the year | $464,119 | $253,089 |
| Cost of merchandise produced during the year | + 136,094 | + 164,431 |
| Total cost of goods sold | 600,213 | 417,520 |

------

[21]For businesses for which production, purchase, or sale of merchandise is an income-producing factor, inventories at the beginning and end of each taxable year are necessary. Sec. 1.471-1, Income Tax Regs. Altermeds, LLC, was such a business, and therefore was required to use beginning and ending inventories. At one point during discovery, Alterman and Gibson asserted that Rev. Proc. 2000-22, 2000-1 C.B. 1008, as modified and superseded by Rev. Proc. 2001-10, 2001-1 C.B. 272, relieved Altermeds, LLC, of the obligation to account for inventories. In response, the IRS filed a memorandum taking the position that Alterman and Gibson misinterpreted Rev. Proc. 2000-22, supra. Alterman and Gibson did not rely on Rev. Proc. 2000-22, supra, after that. For example, they did not cite Rev. Proc. 2000-22, supra, in their briefs. Therefore, they have waived any argument that Rev. Proc. 2000-22, supra, relieved Altermeds, LLC, of the obligation to account for inventories.

The Schedules C for Altermeds, LLC, reported that its income was calculated using the cash method of accounting. In certain situations, farmers may use the cash method of accounting as an alternative to the inventory method. Kennedy v. Commissioner, 89 T.C. 98, 103 (1987). Alterman and Gibson have not contended that they are farmers for this purpose and therefore have waived any argument that they were entitled to use the cash method of accounting as farmers.

**[*33]** By comparison the IRS concedes that the cost-of-goods-sold allowances for 2010 and 2011 are:[22]

|  | 2010 | 2011 |
|---|---|---|
| Total cost of goods sold | $452,292 | $232,772 |

The IRS makes a threshold argument that the method of computing cost of goods sold urged by Alterman and Gibson is improper because it does not account for beginning and ending inventories. That their method ignores beginning and ending inventories can be seen from the formula supra p. 31: cost of goods sold equals beginning inventory, plus purchase costs, plus production costs, minus ending inventory. Alterman and Gibson's argument for cost-of-goods-sold allowances relies entirely on purchase costs and production costs. It assumes that cost of goods sold equals purchase costs plus production costs. Thus, their method leaves out beginning inventory and ending inventory. Such a method is indeed improper. See sec. 1.471-1, Income Tax Regs.

As an alternative argument, Alterman and Gibson contend that the Court should estimate, under Cohan, the relevant beginning and ending inventories for each year. This task is impossible on this record. To calculate cost of goods sold for 2010, the relevant beginning inventory is the inventory on hand at the

---

[22]For the calculation of these amounts, see supra notes 16 and 17.

[*34] beginning of 2010, which is by definition the ending inventory for 2009.

Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 722 (1981) ("Bearing in mind that beginning inventory for any given year is equal to the ending inventory for the prior year, it is easy to see that an error in any year carries forward to every subsequent year.").  To estimate ending inventory for 2009, we would first need to estimate the types of products and unit quantities on hand at the end of 2009.  This is called a physical inventory.[23]  There is no information in the record regarding the physical inventory on hand at the end of 2009.  Even if we had a physical inventory for the end of 2009, we would need to assign a cost to each unit.  Ending inventory for 2009 is composed solely of merchandise purchased during 2009 because Altermeds, LLC, did not produce any marijuana in 2009 and because it began its operations in 2009.  There is no information in the record regarding the cost of merchandise purchased by Altermeds, LLC, in 2009.[24]  Alterman and

---

[23]A physical count requires a determination of how many types of products are in inventory.  See Stephen F. Gertzman, Federal Tax Accounting, para. 6.08[2][a] (2d ed. 1993).  Although we generally understand that the dispensary sold products like buds, joints, and brownies (and therefore probably had these products on hand at the end of 2009), we do not know enough to determine whether each of these should be considered a product type or whether each of these groups should be broken into different product types.

[24]Alterman and Gibson attached a Schedule C for Altermeds, LLC, to their 2009 return.  They reported $0 as beginning inventory, which is the correct

(continued...)

**[\*35]** Gibson have pointed to no evidence in the record to give us a reasonable basis for estimating the ending inventory for 2009.[25]  In conclusion, there is no way for us to estimate the ending inventory for 2009 and therefore the beginning inventory for 2010.

It is also impossible to estimate the ending inventory for 2010.  We would first need to estimate the physical inventory at the end of 2010, i.e., unit quantities by product type.  Then, using a cashflow assumption (such as first-in-first-out), we would assign a cost value to each unit of physical inventory at the end of 2010 by importing a cost value from (1) a unit in the beginning inventory for 2010, (2) a unit purchased during 2010, or (3) a unit produced during 2010.  Secs. 1.471-1, 1.471-3, 1.471-11, Income Tax Regs.; see also Stephen F. Gertzman, Federal Tax Accounting, paras. 6.06, 6.07, and 6.08 (2d ed. 1993).  As explained above,

[24](...continued)
amount because Altermeds, LLC, started operating in 2009.  They reported no production costs.  They reported purchase costs of $72,564 but the record does not contain evidence to show how this dollar amount was calculated, such as receipts for merchandise purchases, a physical inventory or other documentation.  Ending inventory for 2009 was reported as $0.  We find the ending inventory amount unreliable.  If Altermeds, LLC's inventory was $0 at the end of 2009, it would not have had any inventory on hand.  We find this unlikely.  Alterman and Gibson calculated cost of goods sold using only purchase costs, ignoring ending inventory.  This is incorrect.

[25]They reported on Altermeds, LLC's 2010 Schedule C the beginning inventory as zero, but they do not argue that this amount is correct.

**[*36]** however, we do not have the cost values for units in the beginning inventory

for 2010.[26]  And, for units purchased during 2010, at most we have aggregate cost

data, rather than the cost of any particular unit of merchandise.[27]  And, for units

produced during 2010, we cannot even tell from the record whether any units of

any type of marijuana merchandise were produced by Altermeds, LLC, during

2010.

To estimate ending inventory for 2011, there are similar problems that are

magnified by the lack of data from prior years.  Furthermore, by 2011, Altermeds,

---

[26]The following hypothetical illustrates the importance of knowing the cost
of beginning inventory.  Suppose the following:
- In 2009, Altermeds, LLC, buys three joints at different times during
  the year for $3, $4, and $5, respectively.
- In 2009, it sells none of these joints.  So all three joints are in the
  ending inventory in 2009 (and therefore are in beginning inventory
  for 2010).
- In 2010, Altermeds, LLC, sells two of the three joints.

If we use the first-in-first-out cashflow assumption, then the two joints sold in
2010 were the $3 and $4 joints.  The $5 joint remains in inventory in 2010 and it
has an inventory cost of $5.  The $5 amount is used to compute ending inventory
for 2010 (along with the cost of all other products in ending inventory).  Thus, we
can compute ending inventory for 2010 only if we know beginning inventory for
2010.

[27]The check-register entries contain the most detail in the record concerning
merchandise purchases.  Nevertheless, we cannot determine unit quantities or
assign unit costs as the entries are minimally informative and incomplete and
cover only a fraction of the merchandise purchases.

[*37] LLC, was growing some of its own marijuana, but the record does not include inventory documentation for self-grown marijuana.

It is improper in this case for the Court to estimate beginning and ending inventories. The Court need not reach the question of the cost of purchasing merchandise or the cost of producing merchandise during the years at issue. These amounts are relevant to cost of goods sold only when they are used in combination with beginning and ending inventory.[28]

We hold that the cost-of-goods-sold allowances for Altermeds, LLC, are $452,292 for 2010 and $232,772 for 2011, which are the amounts conceded by the IRS.[29]

---

[28]As a further alternative, Alterman and Gibson contend that the Court should determine cost of goods sold for each year by multiplying Altermeds, LLC's gross receipts for each year by a ratio similar to the ratio used in Olive v. Commissioner, 139 T.C. 19 (2012), aff'd, 792 F.3d 1146 (9th Cir. 2015). In Olive v. Commissioner, 139 T.C. at 35, we estimated the costs of goods sold for a medical-marijuana business by multiplying its gross receipts by a comparative ratio of gross receipts to costs of goods sold. We determined the comparative ratio of gross receipts to costs of goods sold from the testimony of two expert witnesses, Henry Levy and Dale Gieringer. Id. Alterman and Gibson called Levy as an expert witness. However, the Court ruled that his testimony was inadmissible and excluded it from evidence. Unlike the record in Olive, the record in this case contains no evidence to support a ratio comparison with other medical-marijuana businesses.

[29]It appears that the IRS determined the amounts it conceded by adding production costs to purchase costs. However, it does not concede that this is the

(continued...)

**[\*38]** III.    <u>Section 6662(a) Penalties</u>

The IRS takes the position that Alterman and Gibson are liable for 20% accuracy-related penalties under section 6662(a) because the underpayments of tax for 2010 and 2011 are attributable to negligence or, alternatively, to substantial understatements of income tax.  <u>See</u> sec. 6662(b)(1) and (2).

Section 6662(a) imposes a penalty equal to 20% of an underpayment that is attributable to negligence, or to a substantial understatement of income tax, or to various other causes.  Sec. 6662(b).  An understatement of income tax is generally the difference between the correct tax and the tax reported on the return.  Sec. 6662(d)(2)(A).  An understatement is substantial if it exceeds the greater of "(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000."  Sec. 6662(d)(1)(A).  Negligence includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly.  Sec. 1.6662-3(b)(1), Income Tax Regs.  The penalty is not imposed on any portion of an underpayment if there was a reasonable cause for such portion and the taxpayer acted in good faith with respect to that portion.  Sec. 6664(c)(1).  Section 6751(b)(1) provides that certain penalties cannot be assessed unless the initial

_____

[29](...continued)
proper method of calculating cost of goods sold.

[*39] determination of the assessment is personally approved in writing by the immediate supervisor of the individual making the determination.

The IRS has the burden of producing evidence that it is appropriate to impose the penalty. Sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). If the IRS has met its burden of production, the taxpayer has the burden of persuading the Court that it is inappropriate to impose the penalty, for example, because a portion of the underpayment was due to reasonable cause and good faith. Higbee v. Commissioner, 116 T.C. at 447.

The IRS's burden of producing evidence includes producing evidence that there was a substantial understatement of income tax. Avrahami v. Commissioner, 149 T.C. __, __ (slip op. at 98) (Aug. 21, 2017). The taxes reported on the returns are determinable because the returns are in the record. Whether substantial understatements of income tax exist, and if so, in what amounts, will depend upon the recalculation of Alterman and Gibson's 2010 and 2011 tax liabilities taking into account (1) their concession regarding underreported gross receipts and (2) the holdings in this opinion. We leave these calculations to the parties under Rule 155.

Regardless of whether the underpayments were due to substantial understatements of income tax, we hold that they were due to negligence.

[*40] Alterman and Gibson did not keep adequate records to compute reliable beginning and ending inventories for Altermeds, LLC. Alterman and Gibson acted negligently by failing to keep adequate books and records. See sec. 1.6662-3(b)(1), Income Tax Regs. The IRS has met its burden of producing evidence that the underpayments are due to negligence. Alterman and Gibson have not persuaded us otherwise.

In a deficiency case, the IRS's burden of production includes the burden of producing evidence that it complied with the supervisory-approval requirement of section 6751(b)(1) for certain penalties. See Graev v. Commissioner, 149 T.C. __ (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016). The IRS satisfied this burden. It introduced a penalty approval form bearing RA Tipton's name and the signature of RA Tipton's supervisor demonstrating his approval. The supervisor testified that RA Tipton had initially determined the penalties and that the supervisor had approved the initial determination.

At trial, Alterman and Gibson objected to the admissibility of the penalty approval form. They argued that the penalty approval form contains RA Tipton's expert opinions and that these opinions could be presented only through expert testimony. (RA Tipton testified at trial as a fact witness, not an expert witness.). We overruled the objection and admitted the penalty approval form into the

[*41] record.  In post-trial briefing, Alterman and Gibson urge us to reconsider the admissibility of the penalty approval form on the same grounds they gave for their objection at trial.  Their objection was meritless.  The IRS offered the penalty approval form to show that RA Tipton had initially determined that the penalties should be imposed (and that his supervisor approved the initial determination), not to show that the penalties are appropriate.

Alterman and Gibson argue that the IRS did not comply with the supervisory-approval requirement because RA Tipton did not allow petitioners enough time to fully present a reasonable-cause defense to the accuracy-related penalty before he submitted their case to his supervisor.  But section 6751(b)(1) requires only that the penalty be "personally approved (in writing) by the immediate supervisor".  It does not require the supervisor to follow any specific procedure in determining whether to approve the penalty.

Alterman and Gibson argue that there was reasonable cause for their underpayments and that they acted in good faith.  Taxpayers can demonstrate reasonable cause and good faith if they reasonably relied on advice about the appropriate tax treatment of their business.  Sec. 1.6664-4(c)(1), Income Tax Regs.  However, Alterman and Gibson neither sought or received advice from Comiskey and Pendleton regarding appropriate inventory accounting or the effect of section

**[*42]** 280E. Sec. 1.6664-4(c)(2), Income Tax Regs. Furthermore, Alterman and Gibson did not ask whether businesses that sell medical marijuana or violate federal drug trafficking laws are taxed differently from other businesses. This lack of inquiry evinces their lack of interest in complying with the federal tax laws. Sec. 1.6664-4(b)(1), Income Tax Regs. (providing that the most important factor in determining whether a taxpayer acted with reasonable cause and in good faith is the extent of the taxpayer's effort to assess his or her proper tax liability for the year).

Alterman and Gibson did not act with reasonable cause and in good faith with respect to the 2010 and 2011 underpayments. Therefore, we hold they are liable for the accuracy-related penalty for each year.

In reaching our holdings, we considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.