T.C. Memo. 2020-52

UNITED STATES TAX COURT

RICHMOND PATIENTS GROUP, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6504-18.                      Filed May 4, 2020.

<u>Jeffrey B. Kahn</u>, for petitioner.

<u>Cameron W. Carr</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  In a notice of deficiency dated January 17, 2018,

respondent determined Richmond Patients Group (Richmond) had deficiencies of

$681,679 and $908,855 and was liable for accuracy-related penalties pursuant to

section 6662(a) of $136,336 and $181,771 for 2014 and 2015 (years in issue),

**[\*2]** respectively. After concessions,[1] the issues for our consideration are whether: (1) Richmond is entitled to additional costs of goods sold (COGS) or deductions for business expenses other than those respondent allowed; (2) Richmond was a reseller or a producer of marijuana pursuant to section 471 during the years in issue; (3) Richmond is allowed to change its accounting method pursuant to section 446 for tax year 2015; and (4) Richmond is liable for accuracy-related penalties pursuant to section 6662(a).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated in our findings by this reference. Richmond was a California corporation with its primary place of business in Richmond, California, when its petition was timely filed.

---

[1]On September 11, 2019, the parties filed a stipulation of settled issues resolving some of the issues.

**[*3]** I.    Background on Richmond

Richmond is a California nonprofit mutual benefit corporation with members, rather than shareholders, that is treated as a C corporation for Federal tax purposes.  In 2010 Richmond obtained a license from the city of Richmond to open a medical marijuana facility.  During the years in issue Richmond operated a medical marijuana dispensary.  It did not offer any therapeutic or other services.

Access to the dispensary, either for selling marijuana to or buying marijuana from Richmond, was granted only through membership.  To become a member, as a patient, provider, or member employee, a person had to have a valid physician's recommendation to use marijuana, a valid form of picture identification from the State of California, and a signed membership agreement form.  Richmond also allowed access to the dispensary to member caregivers.  To become a member caregiver a person had to provide a valid physician's recommendation allowing him or her to purchase and transport marijuana on behalf of his or her patient, a valid form of picture identification from the State of California, and a signed membership agreement form.

Four board members operated Richmond, and William Koziol, a board member, served as Richmond's managing director.  Mr. Koziol held a bachelor's degree in business administration and was a licensed certified public accountant

**[*4]** (C.P.A.) in California. He worked at an accounting firm as an auditor after college. His C.P.A. license was inactive during the years in issue, and he never practiced as a C.P.A. or prepared tax returns.

Richmond's marijuana dispensary was around 3,000 square feet, and approximately 50% of the total space was designated for purchasing and processing marijuana products. The reception and retail floor occupied 25% of the total space, and administration and storage occupied the remaining 25%. Richmond employed a staff of approximately 22 members, including 2 buying managers and an accounting manager.

The buying managers were responsible for purchasing bulk marijuana products. Richmond purchased marijuana-containing products consisting of flowers, concentrates, and edibles. Marijuana flowers accounted for at least 60% of its products, concentrates accounted for 20%, and edibles accounted for 10%. The remaining purchases were nonmarijuana products. For the years in issue Richmond acquired all of its bulk marijuana products from individuals who were members of the dispensary, referred to as member providers. These transactions took place in a designated area of the dispensary. Richmond did not provide any of its member providers with clones or seeds. All nonmarijuana products were purchased from third-party vendors.

**[*5]** Richmond purchased marijuana flowers in one-pound increments and concentrates in one-ounce increments. The buying managers inspected product quality, graded marijuana products, and determined how much to offer member providers for the products. Member providers who had an existing relationship with Richmond or who offered a product that was in high demand were paid in full at the time of purchase. Richmond often paid member providers a 25% to 50% downpayment when the product was brought in and paid the remainder once the product passed testing. All marijuana that failed testing was returned to the member providers.

Consistent with a city of Richmond ordinance, all marijuana products had to be tested offsite by an independent laboratory before Richmond could sell the products to its members. Richmond contracted with a third-party independent laboratory to test the products it purchased. After initial inspection the buying managers were responsible for contacting the laboratory to collect product samples for testing. Richmond paid the laboratory for the cost of testing.

After testing, marijuana products were transferred into separate storage safes. Marijuana flowers from member providers came already trimmed and dried (or cured) to a certain degree. Richmond further trimmed marijuana flowers of nonsellable stems and dried them in its storage safes. During this process the

[*6] flowers could lose 3-10 grams of their weight. Richmond used a portion of the trimmings to create secondary products such as pre-rolled joints and smaller buds.

Richmond's employees processed and broke down marijuana flowers and concentrates into salable units--marijuana flowers into increments of 1 gram, 1.75 gram, and 3.25 grams, and concentrates into half- and one-gram increments.[2] Edibles were purchased in bulk but came in individually prepackaged units ready for immediate resale. Other than testing, edibles did not require further processing.

Richmond stored marijuana flowers in plastic bags or glass containers while they continued drying until they reached an optimal moisture content. Richmond used humidity control systems designed to ensure that marijuana flowers would not dry out too quickly or increase moisture content before being sold to members. Other than the humidity-controlled storage area, drying the marijuana flowers did not require any special type of machinery. Richmond packaged marijuana flowers in safety-sealed Mylar bags with warning labels required by the State of

---

[2]Even though marijuana flowers and concentrates were purchased in pounds and ounces, respectively, they were prepared for resale in grams. There are approximately 454 grams in a pound and approximately 28 grams in an ounce.

[*7] California.  Richmond packaged concentrates in small glass or plastic containers.  Richmond labeled the products to conform with California labeling laws.

Richmond used MJ Freeway Business Solutions (MJ Freeway), a point of sale system, to track its inventory from purchase through processing to final sale.  All marijuana products stayed in MJ Freeway as bulk inventory until Richmond received the test results.  Richmond used MJ Freeway to track byproducts, stem and weight loss of marijuana flowers, packaging loss, and any weight variances.

II.    Income Tax Returns and Notice of Deficiency

Richmond's accounting manager used QuickBooks to prepare profit and loss statements, balance sheets, and sales reports, which were provided to its accountant.  She used information from MJ Freeway to make entries in QuickBooks.  Richmond's accountant used the financial reports to prepare its Federal income tax returns.

Beginning with the filing of its 2009 Federal income tax return, Richmond adopted the first in, first out (FIFO) cost inventory method of accounting for resellers.  It timely filed Forms 1120, U.S. Corporation Income Tax Return, for the years in issue.  On its 2014 Form 1120 Richmond reported $4,970,120 of gross receipts and subtracted $3,234,028 in COGS, which comprised beginning

[*8] inventory plus purchases and other costs less ending inventory. Richmond's other costs for determining its calculation of COGS consisted of: $48,881 for damage and shrinkage, $5,733 for depreciation, $149,001 for inventory security, $16,907 for packaging, $63,711 for permit fees on gross revenue, and $32,200 for testing. Additionally, Richmond claimed business expense deductions totaling $1,653,948 for the following: compensation to officers; salaries and wages; repairs and maintenance; rents; taxes and licenses; charitable contributions; depreciation; pension, profit sharing, etc., plans; employee benefits programs; and other expenses.

In February 2016 respondent notified Richmond that its 2014 tax return was being examined. The revenue agent, accompanied by Mr. Koziol, toured Richmond's facility on March 24, 2016. On March 15, 2016, Richmond filed its 2015 Form 1120, on which it reported $6,254,843 in gross receipts and subtracted $5,982,023 in COGS. Richmond claimed business expense deductions totaling $43,555 which included taxes and licenses and charitable contributions. In its calculation of COGS Richmond reported $1,404,534 of other costs consisting of: $10,417 for amortization, $60,928 for damage and shrinkage, $582 for depreciation, $1,080,541 for indirect COGS, $122,205 for inventory security, $67,260 for local fees on gross revenue, $30,201 for packaging, and $32,400 for

**[\*9]** testing. Richmond also included in its calculation of COGS $1,353,705 for cost of labor.

Along with its Form 1120 Richmond submitted Form 3115, Application for Change in Accounting Method, for 2015, which changed its method of accounting from period costs to inventoriable costs, referred to as indirect COGS. On its Form 3115 Richmond reported that it did not have any Federal income tax returns under examination. Beginning with its 2015 tax year Richmond calculated the beginning and ending inventory with an adjustment of $70,701 to account for previously expensed indirect costs and planned to spread out this adjustment over four years. On its 2015 tax return Richmond reported a section 481(a) adjustment of $17,675.

On November 16, 2016, Richmond submitted a Form 1120X, Amended U.S. Corporation Income Tax Return, for 2014. The amended tax return moved most of the deductions for business expenses to COGS. Richmond's amended tax return reported other costs of $1,965,784.

On November 16, 2016, Richmond also submitted a Form 1120X for 2015 which proposed changes that would reduce its tax liability by $9,954. Along with the amended tax return Richmond resubmitted Form 3115 for 2015. On Form

**[*10]** 3115 Richmond again reported that it did not have any Federal income tax returns under examination.

On February 15, 2017, respondent mailed to Richmond Letter 950, commonly referred to as a 30-day letter, and the revenue agent's examination report. The examination report set forth respondent's proposed adjustments to income and asserted income tax deficiencies and accuracy-related penalties pursuant to section 6662(a). The revenue agent's immediate supervisor approved the section 6662 penalties and signed a Civil Penalty Approval Form on February 15, 2017.

On the basis of Richmond's original tax returns respondent issued a notice of deficiency on January 17, 2018, which made adjustments to COGS and disallowed business expense deductions pursuant to section 280E as follows:[3]

---

[3]Richmond reported other income of $17,675 as its sec. 481(a) adjustment for 2015.

[*11]

| Adjustments to income | 2014 | 2015 |
|---|---|---|
| Rents | $307,500 | -0- |
| COGS | 316,433 | $1,404,534 |
| Compensation of officers | 208,000 | -0- |
| Salaries and wages | 800,785 | -0- |
| Repairs and maintenance | 4,741 | -0- |
| Taxes and licenses | 92,161 | 20,267 |
| Depreciation | 1,828 | -0- |
| Pension and profit sharing | 17,181 | -0- |
| Employee benefit programs | 30,603 | -0- |
| Other deductions | 189,149 | -0- |
| Cost of labor | -0- | 1,353,705 |
| Inventory (beginning) | -0- | 70,701 |
| Other income | -0- | (17,675) |
| Inventory (ending) | -0- | (194,667) |
| Contributions | 2,000 | 23,288 |

In the stipulation of settled issues the parties agreed that Richmond substantiated all amounts underlying deductions claimed for the years in issue. Respondent has conceded that costs for testing and packaging previously disallowed as direct costs for the years in issue should be allowed as part of COGS.

**[*12]**                                    OPINION

I.    Burden of Proof

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under section 7491(a) in certain circumstances the burden of proof may shift from the taxpayer to the Commissioner. Richmond has neither shown nor claimed that it meets the requirements of section 7491(a) to shift the burden of proof to respondent as to any relevant factual issue. Accordingly, the burden of proof remains with Richmond.

II.   Deductions

Deductions are a matter of legislative grace, and a taxpayer must prove its entitlement to deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers must maintain sufficient records to substantiate any deductions claimed. Sec. 6001.

Generally, section 162(a) allows a taxpayer to deduct from gross income ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Section 261, however, provides that "[i]n

**[\*13]** computing taxable income no deduction shall in any case be allowed in respect of the items specified in this part", which includes section 280E. See Californians Helping to Alleviate Med. Problems, Inc. v. Commissioner (CHAMP), 128 T.C. 173, 180 (2007). Section 280E precludes taxpayers from deducting any expense related to a business that consists of trafficking in a controlled substance. See Olive v. Commissioner, 139 T.C. 19, 29 (2012), aff'd, 792 F.3d 1146 (9th Cir. 2015). Section 280E disallows deductions only for business expenses and does not preclude Richmond from taking into account its COGS. See CHAMP, 128 T.C. at 178 n.4.

We have previously held that medical marijuana is a controlled substance. Id. at 180-181; see also Gonzales v. Raich, 545 U.S. 1 (2005); United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483 (2001). The dispensing of medical marijuana, while legal in California, is illegal under Federal law. See Olive v. Commissioner, 139 T.C. at 39. Congress in section 280E has set an illegality under Federal law as one trigger to preclude a taxpayer from deducting expenses incurred in a medical marijuana dispensary business. Id. This is true even if the business is legal under State law. Id.

Richmond operated a medical marijuana dispensary in which it purchased and sold marijuana products. It accrued immaterial amounts of revenue from the

[*14] sale of nonmarijuana products, and it did not offer its members or the public any therapeutic or other services. Therefore, we hold that pursuant to section 280E Richmond is not entitled to its claimed deductions for the following business expenses: rents, compensation of officers, salaries and wages, repairs and maintenance, taxes and licenses, charitable contributions, depreciation, pension and profit sharing plans, employee benefit programs, and other expenses.

III.    Cost of Goods Sold

Section 280E disallows only deductions for the expenses of a business and does not preclude taxpayers from taking into account COGS. See CHAMP, 128 T.C. at 178 n.4. COGS is not a deduction within the meaning of section 162(a) but is subtracted from gross receipts in determining a taxpayer's gross income. See Max Sobel Wholesale Liquors v. Commissioner, 69 T.C. 477 (1977), aff'd, 630 F.2d 670 (9th Cir. 1980); sec. 1.162-1(a), Income Tax Regs. COGS is the cost of acquiring inventory, through either production or purchase. Patients Mut. Assistance Collective Corp. v. Commissioner (Patients Mut.), 151 T.C. 176, 205 (2018); Reading v. Commissioner, 70 T.C. 730, 733 (1978), aff'd, 614 F.2d 159 (8th Cir. 1980). COGS is generally determined under section 471 and its accompanying regulations. See secs. 1.471-3, 1.471-11, Income Tax Regs.

**[*15]** Section 471 and its accompanying regulations direct taxpayers to section 263A for additional rules. Section 263A instructs both producers and resellers to include "indirect" inventory costs in COGS. See sec. 263A(a)(2)(B), (b); sec. 1.263A-1(a)(3), (c)(1), (e), Income Tax Regs. Indirect costs are defined broadly as all costs other than direct material costs and direct labor costs (for producers) and acquisition costs (for resellers). Sec. 1.263A-1(e)(3), Income Tax Regs.

Section 263A includes in COGS only expenses that are otherwise deductible. Sec. 263A(a)(2). Section 280E prohibits taxpayers from taking business deductions under section 162. Therefore, section 263A does not allow Richmond to capitalize indirect costs into COGS that it would not otherwise be able to deduct. See Patients Mut., 151 T.C. at 209.

Richmond contends that it was a producer for purposes of sections 263A and 471 and should be entitled to deduct indirect inventory costs under section 1.471-3(c), Income Tax Regs. Pursuant to section 263A and its accompanying regulations, the following are included in the definition of produce: construct, build, install, manufacture, develop, improve, create, raise, or grow. Sec. 263A(g)(1); sec. 1.263A-2(a)(1)(i), Income Tax Regs. Pursuant to the section 471 regulations, "[c]osts are considered to be production costs to the extent that they are incident to and necessary for production or manufacturing operations or

[*16] processes." Sec. 1.471-11(b)(1), Income Tax Regs. For purposes of section 471 "produce" means the same thing as in section 263A(g)(1) and section 1.263A-2(a)(1)(i), Income Tax Regs. Patients Mut., 151 T.C. at 211.

In Patients Mut., 151 T.C. at 213, also involving a California medical marijuana dispensary, we held that the taxpayer was a reseller, not a producer, for purposes of section 471. The taxpayer did not own the marijuana plants during cultivation, did not own or control the grower-provider, and was under no obligation to purchase what the grower produced. Id. at 212-213. However, the taxpayer did provide marijuana clones to its members to grow. Id. at 212.

In contrast Richmond did not provide live plants, clones, or seeds to its members. Richmond was under no obligation to purchase what its member providers offered for sale. Rather, it purchased bulk marijuana grown by its members for resale. Member providers trimmed the marijuana flowers before Richmond purchased them. No improvements were made to the marijuana from the time it was purchased to the time it was sold. Richmond inspected, sent out for testing, trimmed, dried and maintained the stock, and packaged and labeled marijuana. These activities are those of a reseller and not a producer. See Alt. Health Care Advocates v. Commissioner, 151 T.C. 225, 243 (2018) (holding that the taxpayer was not a producer because it did not grow, create, or improve its

[*17] marijuana products to the extent required by section 263A or 471 as the only evidence before the Court was "that the dispensary, inspected, packaged, trimmed, dried, and maintained the stock"); Patients Mut., 151 T.C. at 213 n.26 (noting that the taxpayer's processing, which included reinspection, packaging, and labeling, were activities that "resellers do without losing their character as resellers").

We conclude that Richmond was a reseller for purposes of section 471. Therefore, Richmond is not allowed to deduct additional indirect costs included in COGS for the tax years in issue.[4]

IV.     Change of Accounting Method

Pursuant to section 446(a) taxable income must be computed under the method of accounting on the basis of which the taxpayer regularly computes its income in keeping its books. A method of accounting is only acceptable if in the opinion of the Commissioner it clearly reflects income. Sec. 446(b); sec. 1.446-1(a)(2), Income Tax Regs. In general, a taxpayer wishing to change its method of accounting must obtain the Commissioner's prior consent. Sec. 446(e); sec. 1.446-1(e)(2)(i), Income Tax Regs. The Commissioner is vested with wide

---

[4]The parties agreed in the stipulation of settled issues that Richmond's tax returns for the years in issue reported additional indirect costs for damage and shrinkage, depreciation, inventory security, and permit fees and that its 2015 tax return reported indirect COGS.

**[\*18]** discretion in deciding whether to consent to a change of accounting method. Brown v. Helvering, 291 U.S. 193, 204 (1934). The Commissioner has authority to give consent retroactively to a change in a taxpayer's method of computing taxable income that has already been made. See Barber v. Commissioner, 64 T.C. 314, 319 (1975).

On March 15, 2016, Richmond included Form 3115 with its 2015 Form 1120. It requested respondent's consent to change its inventory valuation method of accounting to that of a producer under the regulations prescribed in section 1.471-3(c), Income Tax Regs. Since its inception Richmond had used the FIFO method of accounting for resellers pursuant to section 1.471-3(b), Income Tax Regs. The accounting method a taxpayer adopts must be consistent from year to year unless the Commissioner authorizes a change. Huntington Sec. Corp. v. Busey, 112 F.2d 368, 370 (6th Cir. 1940).

Respondent properly disallowed Richmond's proposed change of accounting method. We concluded previously that Richmond was not a producer, but rather a reseller, for 2015. Richmond did not provide any evidence of changes in its business which would justify a change in its method of accounting. The proposed method of accounting change would not clearly reflect income. Furthermore, respondent did not consent to the change. Accordingly, we sustain

[*19] respondent's determination denying Richmond's request for consent to change its method of accounting because Richmond was not a producer of marijuana.

## V.    Accuracy-Related Penalty Pursuant to Section 6662(a)

Section 6662(a) and (b)(1) and (2) imposes a penalty equal to 20% of the portion of an underpayment of tax required to be shown on a return that is attributable to "[n]egligence or disregard of rules or regulations" and/or a "substantial understatement of income tax." Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b). Sec. 1.6662-2(c), Income Tax Regs.

Respondent determined that Richmond is liable for accuracy-related penalties pursuant to section 6662(a). The burden of production as to the penalties remains with Richmond because section 7491(c) does not apply to corporations. See NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006). We held previously that the Commissioner does not have the burden of production as to the supervisory approval requirement under section 6751(b) for a penalty determined against a corporation in a notice of deficiency. Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. 224, 231-232 (2018). The record here includes a penalty

[*20] approval form establishing respondent's compliance with section 6751(b). Since Richmond has not raised as an affirmative defense whether respondent complied with section 6751(b), we conclude that Richmond has waived this defense. See id. at 237.

For a corporation an understatement of income tax is substantial if it exceeds the lesser of 10% of the tax required to be shown on the return (or, if greater, $10,000) or $10 million. Sec. 6662(d)(1)(B). If after calculations pursuant to Rule 155 Richmond has understated more than 10% of the tax required to be shown on its tax return and by more than $10,000, it will have a substantial understatement of income tax.

The section 6662(a) penalty does not apply with respect to any portion of the underpayment for which it is shown that the taxpayer had reasonable cause and acted in good faith. Sec. 6664(c)(1). The determination of reasonable cause and good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. We also consider the taxpayer's experience, knowledge, and education. See id.

For purposes of section 6664(c) a taxpayer may be able to establish reasonable cause and good faith by showing reliance on professional advice. See also sec. 1.6664-4(c), Income Tax Regs. To establish good faith and reasonable

**[\*21]** cause through reliance on professional advice, the taxpayer must prove by a preponderance of the evidence: "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Richmond contends that it acted reasonably and in good faith because there was a lack of guidance regarding section 280E. In CHAMP, 128 T.C. at 184-185, we held that section 280E prevented the taxpayer from deducting business expenses which were allocated to its activity of providing medical marijuana. For 2014 Richmond claimed deductions that were impermissible pursuant to section 280E, and for the following year Richmond moved these expenses to COGS. Richmond's actions indicate that it was aware when it filed its 2015 tax return that deductions were not allowed pursuant to section 280E. Furthermore, there was relevant authority directly against Richmond's position for 2014.

Richmond provided no evidence in support of business changes that necessitated a change in its method of accounting. On its 2015 tax return Richmond made a change by shifting expenses to indirect COGS. Richmond did not receive consent from respondent to change its accounting method.

[*22] The record shows that Richmond provided its accountant with financial statements to prepare its tax returns. Richmond provided no evidence that it relied on its accountant for advice regarding sections 280E, 471, and 263A. Merely hiring a professional to prepare an income tax return, without giving the professional necessary information or relying on his or her advice, does not absolve a taxpayer from liability for a penalty. Alt. Health Care Advocates v. Commissioner, 151 T.C. at 247. Accordingly, subject to computations under Rule 155, we hold that Richmond is liable for the accuracy-related penalties pursuant to section 6662(a) for the years in issue.

We have considered all of the arguments made by the parties and, to the extent not addressed herein, we find them moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.